MEEK AND THORNTON, EX'RS, &c. *v.* B. R. PERRY AND WIFE.

1. CONSTRUCTION: FRAUD: TRANSACTIONS BETWEEN GUARDIAN AND WARD, ETC.: RULE IN RELATION.—The law watches, with the greatest jealousy, transactions and dealings between guardian and ward, attorney and client, and other persons standing to each in the relation of authority on the one hand, and dependence and confidence on the other; and will not permit them to stand, unless the circumstances demonstrate the fullest deliberation on the part of the ward, client, etc., and the most abundant good faith on the part of the guardian, attorney, or other trustee.

2. SAME: SAME.—In transactions between guardian and ward, the law, upon a principle of public policy, and to protect the ward against the efforts of overweening confidence and self-delusion, and the infirmities of a hasty, precipitate judgment, presumes the existence of undue influence on the part of the guardian; and therefore, such dealings are *prima facie* void, and will be so held, unless the guardian show, by the clearest proof, that he dealt with the ward exactly like a stranger, taking no advantage of his influence over him or of his superior knowledge in relation to the subject-matter of the transaction, and that the ward's act was the result of his own volition, and upon the fullest deliberation.

3. SAME: SAME: WILL BY WARD IN FAVOR OF GUARDIAN.—The principles of law which protect the interests of wards in transactions with their guardians, extend to wills made by them in favor of their guardians; and hence, a testament made by a ward in favor of his guardian, will be held void, for want of capacity in the testator, unless the legal presumption of undue influence be rebutted by proof. Handy, J., dissented.

4. EVIDENCE: RES GESTÆ.—It is difficult, if not impossible, to lay down any precise general rule, as to what acts and declarations are admissible in evidence as a part of the *res gestæ.* The principal points of attention in determining upon their admissibility, are, whether the circumstances and declarations offered in proof, were contemporaneous with the main fact under consideration, and whether they are so connected with it as to illustrate its character.

5. SAME: SAME.—If the declarations be merely narrations of a past transaction, or if they be not the natural and inseparable concomitants of the main act in controversy, and so connected with the hypothesis they are introduced to support, as to induce the belief that they are the mere result and consequence of the coexisting motives which they are designed to establish, they are inadmissible as a part of the *res gestæ.*

6. SAME: SAME.—In order that declarations may be received in evidence as a part of the *res gestæ,* they must appear to have been made at the time the act was done which they are supposed to characterize, and they must be well calculated to unfold the nature and quality of the facts which they are introduced

Meek and Thornton, Exrs. *v.* Perry and wife.

to explain, and must so harmonize with them as obviously to constitute only one transaction ; they must also be such as may be fairly regarded as the natural suggestion of the coexisting motive which influenced the conduct under investigation, and referable only to that motive and conduct.

7. SAME : SAME.—If, from the experienced connection between the circumstances and situation in which the declarant was placed at the time the declarations were made, and of human conduct and motives under like circumstances generally, the declarations are most likely the result of contrivance and a fraudulent design to conceal the truth, they are inadmissible in evidence as a part of the *res gestæ.* Handy, J., dissented.

8. SAME : SAME : HIGH COURT.—From the inherent difficulty of laying down any precise general rule as to the admissibility of declarations, upon the ground that they are a part of the *res gestæ,* questions in relation thereto must, to a great extent, be left to the sound discretion of the court of the first instance ; and for this reason, this court will, in reviewing such decisions, defer much to the discretion of the court which made it.

APPEAL from the Court of Probate of Panola county.  Hon. O. Harrison, judge.

The cause was submitted in this court upon the following abstract, agreed to by the counsel of both parties.

David McKinnie died in 1837, leaving a widow and two minor daughters,—Mary, who was born August the 27th, 1834, and Louisa R., November 7th, 1836.  In 1840 their uncle, Michael McKinnie, qualified as the guardian of these minors.  On the 7th of July, 1848, Mary, against the wishes of her guardian, intermarried with the appellee, B. R. Perry.

On the 26th of April, 1855, when she was eighteen years and a few months old, under the roof of her guardian, Louisa made the will, the subject of controversy.

The three subscribing witnesses to the will, E. B. Hibbler, B. F. Patton, and J. E. Hoke, testified that the paper purporting to be the will of Louisa R. McKinnie, deceased, was executed, as to all matter of forms, as required by the statute; and that, in their opinion, the decedent was, at the time, of sound mind and disposing memory.  It was admitted that Louisa was then upwards of eighteen years of age.  The will itself was then read, in the words and figures, to wit :—

State of Mississippi, Panola county:

Knowing that it is appointed for all persons to die, and being weak in body, but of sound and disposing mind and memory, I make this, my last will and testament, revoking all others.

I give and bequeath to Sister Mary E. Perry's children, Chany and her two youngest children (Cherrylane and Sam), Diana and her two children (Letty Ann and William).

It is my will that the above property remain in possession of Uncle Michael McKinnie, until Sister Mary E. Perry's children become of age or marry, and if they should die without bodily heirs, this property shall revert to Uncle M. McKinnie or his assigns; and I give and bequeath to David McKinnie, the son of Uncle M. McKinnie, a negro boy named Wallace. I also give and bequeath to William R. McKinnie, the son of Uncle M. McKinnie, a negro boy named Monroe. All the balance of my property, both real and personal, I give and bequeath to Uncle Michael McKinnie.

Witness my hand and seal, April 26th, 1855.

LOUISA R. MCKINNIE. [SEAL.]

Test,
   E. B. HIBBLER,
   B. E. PATTON,
   J. E. HOKE.

The testimony in chief in support of the will here closed.

*In opposition to the will.*—Matthew Strickland proved that, in the year 1840, he married the widow of David McKinnie, who had two children: Mary, now the wife of B. R. Perry, born August 27th, 1834, and Louisa R., now dead, born November 7th, 1836; that these children came with their mother to his house, and became members of his family; and remained with him, except when at school or on a visit, until their mother died, which was June 7th, 1848. Their uncle, Michael McKinnie, was their guardian.

Mary and Louisa were going to school, when their mother died, to a Mr. Harris, who taught in the neighborhood; alternately, they went every Friday evening to witness's house and to their guardian's, and remained until Monday morning, when they were sent back to school. Their washing was all done at witness's house.

Mary was married to B. R. Perry whilst going to school, July 7th, 1848, one month after her mother's death. After Mary's marriage, Louisa came to my house once, if not oftener, on Friday evening as usual. When at my house, she was sent for by her guardian, Saturday morning. When sent for, she wept very much, and seemed very much distressed. I told her that she must continue to come to see me; but she was never afterwards at my house, but once. I sent her word to come and get a part of her mother's clothing. The time of this visit, I cannot state. An old negro woman, a Mrs. Rhodes, and two of McKinnie's daughters, came with her. This was the last time Louisa was at my house. When I heard she was sick, I sent my servant and carriage after her, but after having been absent long enough to have gone to McKinnie's, they returned without her.

I knew Louisa's disposition well. She was affectionate and kind-hearted. The two sisters were as kind and loving towards each other as they could have been. Louisa was pliant and yielding, and generally gave way to her sister's will. Mary was rather disposed to be independent and self-willed.

My wife left but the two children, Mary and Louisa. She owned five negroes when she came home with me, and some other property, and also had a dower interest in lands. Soon after my wife's death, I told McKinnie that I intended to give up the slaves to my wife's children, Mary and Louisa, but that I wished to keep them until I gathered my crop. He replied, that is right. Not a great while after Mary's marriage, McKinnie called on me, and said he wanted me to make to him the right to these negroes; adding that he'd be bound he would then see that Perry did not spend them. To this I replied, it was my wife's wish that her children should have her property, and I intended to give it up to them. After this—I think on the 9th of October—McKinnie called on me in company with Mr. Rosborough, and made a demand on me for these negroes. I told him yes, he could have them at any time when he sent for them; but asked him why he had so demanded them? as I had always told him that I intended them for the children, and would give them up when I gathered my crop. He replied, he had been advised to the course he pursued. The next day McKinnie sent for the slaves, and I sent them to him.

That after Louisa left Mr. Strickland, there was no white female living with him.

Sydney Strickland proved, that he was the son of Matthew Strickland, and was living with his father when he married the widow of David McKinnie, and continued to live with him until her daughter Mary married B. R. Perry, and Louisa went to live with her guardian; that his father appeared to be much attached to the girls—as much so as to his own children, and they appeared to be very much attached to him; and he, witness, felt as much attached to the girls as to his own sisters; that Louisa never visited his father but once after she went to live at her uncle's; and that was soon after she left his father's; and that she never visited in his father's neighborhood after she went to live at her uncle's, so far as he knew.

Martha Rhodes (she is cousin to Mrs. Perry) proved, that in the year 1849, she went from Michael McKinnie's to Mr. Matthew Strickland's with Louisa; that Louisa started from home to go to see old Mr. Strickland; that on returning from Mr. Strickland's, they passed by Mr. Perry's, and she wanted to call there, and proposed to call, to which Louisa made no reply; that a negro woman was with them, who saw Mrs. Perry and called to her, when she came to the gate where witness, Louisa, and the negro woman were, and asked us to go in, when Louisa said she wanted to go in, and would go in, but she knew her uncle would be opposed to it. Mrs. Perry then opened the gate and I went in, and Louisa followed, and we went in the house, and stayed, I think, not over half an hour. Whilst they were in the house, Mrs. Perry told Louisa, that she, Louisa, knew that she, Mrs. Perry, was going to be married; that she told her of it beforehand, and that she did not think she ought to be so distant; and Louisa replied, that she, Mrs. Perry, knew the reason that she did not visit her,—that her uncle was opposed to it.

This witness also proved, that not long prior to the visit above mentioned, she was at Mr. McKinnie's, in a room, quilting with Louisa, when Mr. John White and Mr. Perry called. Mr. Perry sat on his horse at the gate, and Mr. White came to the room where Louisa and I were; and he asked Louisa why she did not go out and see Mr. Perry, and inquire how her sister was. She

made no reply to Mr. White, but turned to me, and asked me to go out and see Mr. Perry. I replied, I will go, if you will go with me. She said she would go with me, but that her uncle would be mad, and then she commenced crying. Neither of us went out.

Before this occurred, Mr. Perry came to Mr. McKinnie's, when I was there; Mr. McKinnie was in the house, but not well; Mr. Perry remained on his horse at the yard gate; Mr. Caraway went out to him, and came back and said Mr. Perry wanted to see Mr. McKinnie; Mr. McKinnie was not able to go out; he, Mrs. McKinnie, Louisa, and myself, were in the same room, and when Mr. Caraway came back, Mrs. McKinnie asked Louisa and myself to go into the dining-room; we both went in, and Mrs. McKinnie shut the door, and then went out to the gate where Mr. Perry was, and I think she came back in the house before Louisa and myself left the dining-room. Louisa did not see Mr. Perry, to speak to him. I think, after Mr. Perry left, Louisa opened the door, and went out. I think Louisa thought a good deal of her sister. The visit to Mr. Strickland's was in the latter part of the winter, or early part of the spring, 1849.

Miss Mary Boyet proved, that she knew Louisa in the years 1849 and 1850; that on the 5th July, 1850, she was with her at her uncle's, Michael McKinnie's, and heard her say, she would visit her sister, Mrs. Perry, if her uncle would let her; and when she became of age she intended to visit her sister. Louisa had just come from school at Columbia, Tennessee. She had come by one of her cousin's, who lived in Tennessee, David McKinnie's, and she said, he said he wanted her to live with him, and that he would carry her to see her sister; but that her uncle was not willing she should go, unless she took her property with her; that he was unwilling to have her property without her, and her cousin David would not take the property. She was crying at the time of this conversation; she is cousin to Mrs. Perry.

M. E. Anderson proved, that she was at the house of McKinnie in the spring of the year 1850, and then and there heard Mrs. McKinnie, in the presence of Mr. McKinnie, say, that Mary Perry never should have Louisa's property; that Mr. McKinnie, at the same time, said, he would rather it should be sunk in the sea, than

that Mary should have it.   Mrs. McKinnie also said, that Louisa never should visit her sister.

Miss Amanda J. Henson proved, that for years she had known Louisa well, having gone to school with her in 1848, and lived within three or four hundred yards of her uncle, Michael McKinnie, while she lived with him; that Louisa, when at home, did not mingle much in society; that Louisa went from home to school, in 1850 or 1851; returned in the summer vacation, then left again, and remained from home until the summer of 1854, when she returned in very feeble health.   That she saw Louisa in March, 1855; she seemed to be in wretched health, and much depressed in spirits; she met her very friendly.   Soon after this, she again met her at church, after which she did not see her until 27th April, 1855. She seemed to be very feeble, and said she could not breathe well. Saw her again on the 29th, still in the same condition; again on the 30th, she was worse; during these visits, saw no one in the room, or about the house, but Mr. McKinnie and family, and his overseer, except on the 29th, Mrs. Sharp went with us, and we found Mrs. Patton and William Hibbler there, besides the family. Myself and mother were sent for on the night of the 30th; we went in company with Mrs. Mitchell; when we reached the house Louisa was dead; no one was about the house but McKinnie and family, and overseer.   During the time I saw her on the 27th, 29th, and 30th, she could not talk much, and it seemed to give her pain to talk and to breathe.   On the 27th, Louisa was sitting in a rocking chair; on the 29th, she was propped up by pillows on a lounge; and on the 30th, she was in bed, propped up by pillows; on the 27th, I insisted she should lay down; she breathed with great difficulty; Mrs. McKinnie, I think, said she could breathe better sitting up.

Mrs. Elizabeth Henson proved, that she had lived within three or four hundred yards of McKinnie since 1840; she saw Louisa on 29th April, 1855; was not sent for to see her; went with Mrs. Sharp and my daughter, and found Mrs. Patton and William Hibbler there, besides the family.   Louisa appeared to be very feeble; was propped up with pillows, her head bound up with a handkerchief; appeared to breathe with great difficulty, and to be suffering very much.   She talked very little; it seemed to give her

pain to talk. I was sent for after Louisa's death; saw no one in her room, after her death, but Mr. and Mrs. McKinnie, family, and servants.

Miss G. D. Harris, a witness whose deposition was taken by appellants, but introduced by appellees, proved, that she knew Louisa R. McKinnie in 1848 and 1849; was intimate with her, she boarding at the house of witness's father; went to school with her, and were classmates; that Louisa talked with witness about her sister Mary's marriage with Perry; heard her. say that Mary was a fool for marrying Perry. When an opportunity was presented, of sending Mary her clothing, shortly after the marriage, she declined sending them, as requested by Mary, saying she did not deserve them; and when the property came to be divided, a certain old negro fell to the lot of Perry and wife, she expressed her sorrow, as she would soon have to be sold, and she wished the old nurse to remain in the family: that these expressions were used at her father's house, and on their way to school, about, and shortly after the marriage of Mary to Perry; that her guardian, M. McKinnie, so far as she recollects, was very much opposed to Mary's marriage; that she thinks McKinnie did prejudice Louisa against Perry and his wife, by the tendency of his language and deportment towards them; she does not know that McKinnie abused Perry, or intended to prejudice Louisa against him; that McKinnie had very great influence over Louisa, insomuch that his will appeared supreme with her in everything; that he appeared to treat her with great kindness, and she in return to treat him with great deference.

Mrs. Ann Jones proved, that she knew Louisa from her birth to her death; that she saw her at Mr. McKinnie's, in the summer of 1854, and asked her if she wished to see her sister Mary, and she said "yes," with tears; she had just been talking to Louisa about her mother, and telling her how much she loved her, her mother being then dead. I told her, that if I were her, I would see her, if I wished to see her. She was deeply affected, and I said no more to her. I thought she had a very kind and affectionate disposition.

Mrs. Harriet M. Anderson proved, that she went with Mrs. Perry to see her sister at Mr. McKinnie's, in the year 1851, as she thinks; the sisters met very affectionately, and seemed very

glad to see each other. As Mrs. Perry and myself went in, Mr. McKinnie was sitting on the piazza; he said, "good evening;" we went in and sat down, and Mr. McKinnie got up and left, and we did not again see him. Miss Louisa was sitting there at the door, when we went in; Mrs. Perry and Louisa talked together; Mrs. Perry, when she left, asked Louisa to go home with her, but she said she could not go; I do not know whether she assigned a reason, or not. We did not stay very long. We were treated very coldly by both McKinnie and his wife; Louisa treated us very kindly. Mrs. McKinnie took a seat on the piazza, and sat there most of the time.

Mrs. Anderson further proved, that she lived about four miles from McKinnie's, and that if Louisa visited in her neighborhood she did not know it; she lived in a sociable neighborhood, and had Louisa either visited or been visited much, thinks she would have known it.

Miss H. E. Barnett proved, that, in 1850, she heard McKinnie say, that he did not wish Louisa to visit in the neighborhood, for the neighbors would influence her to visit her sister, Mrs. Perry; that she recollects at one time she was at McKinnie's, and wished Louisa to go with her to Mrs. Henson's; that Mrs. McKinnie consented, but Mr. McKinnie objected, stating as his reason, that he feared she would be induced to correspond with or visit her sister.

Dr. S. L. Wynn proved, that he was a practising physician, and that as such he attended on Louisa R. McKinnie, the decedent, during her last illness; that he visited her first on 23d of January, A. D. 1855, and again on the 1st February, 1855, on the 20th of the same month, on the 20th of March, and the last time on the 24th of April, 1855; that he found her in the last stage of pulmonary consumption on his first visit; expectoration profuse, and of a decidedly purulent character; fever of a hectic character. He was told by some one of her family, that she was laboring under suppressed menses. She continued to grow worse, and on my last visit, on the 24th of April, she had the same symptoms that she had when I first saw her; her pulse was one hundred and thirty per minute, exacerbation towards evening, with increased heat of skin, circumscribed redness or flush upon the cheeks, breathing difficult and distressing on the slightest exertion; inspiration and expiration

attended with a gurgling sound; night sweats profuse; emaciation and debility very great; swelling of the extremities, particularly of the feet and legs; tongue red; loss of appetite; and on the last visit, McKinnie asked witness as to the condition of Louisa, and witness told him she was very low, and he would not be surprised at her death at any moment, and that she could not live long. Said witness further proved that consumption affects the mind as little, if not less, than almost any other disease; that he always found the said Louisa rational, but he did not think she was capable of any great exertion of mind; that amenorrhœa or hysteria affected the mind more or less; that amenorrhœa or hysteria were identical.

Witness proved, that when he visited Louisa she was not always in the room below stairs, but when not there, she came down, and always saw her in Mrs. McKinnie's room, below; that on his last visit he saw her in Mrs. McKinnie's room, and found and left her there; that said decedent conversed intelligently, though witness conversed with her principally in relation to her disease; that witness at no time observed any great elevation or depression of her spirits; that she appeared calm and composed; that she died of pulmonary consumption, and that she declined gradually.

Dr. —— Tate proved, that he is a physician; that hysteria was the result of a diseased womb, and was produced by suppression of menstruation, and affected the mind; that the symptoms of hysteria were fits of depression of spirits and of elevation of spirits; that he did not consider a person laboring under it of perfectly sound mind, or capable of any great amount of mental labor; that the mind could not be perfectly sound; that the usual symptoms of hysteria were depression of spirits or great hilarity, and that it came on in fits with intervals of calmness, and that in the intervals, between the fits, the mind appeared to be calm and capable of healthy action.

Dr. —— Kinchloe proved, that he was a practising physician; that hysteria was caused by suppression of menstruation, and exhibited itself in fits of depression, and again of great elevation; that hysteria affected the nervous system, and had an effect on the mind; that whilst under its influence, the mind was impaired and incapable of healthy action. Witness had heard the testimony of Dr. Wynn, and from that testimony Louisa was not as capable of

transacting important business on or after the last visit, as she would have been in good health; witness further stated, that the disease hysteria exhibited itself in fits, occurring at intervals, and that the mind of a party laboring under hysteria, might at times be capable of healthy action.

Elijah Wilborn (a justice of the peace) proved, that he regarded Michael McKinnie, whom he knew, as a determined man, of stern and strong will, who would carry his point when he has it in his power; he also proved, that he was in company with B. R. Perry when he met Mary E. and Louisa R. McKinnie on the road going from school to their uncle's, Michael McKinnie's; that they were riding on the same horse, and Mary was riding before; that David McKinnie, son of Michael McKinnie, and Mrs. Henson's children, were in company with them; that B. R. Perry took Mary off the horse, and set Louisa in the saddle, and that he (witness) handed the bridle to Louisa; that he, B. R. Perry, and Mary then proceeded to the house of witness, when B. R. Perry and Mary E. McKinnie were immediately married by Parson Young, who was there waiting for the purpose; that it was a runaway match; that Mary was not then quite fourteen, but well grown.

This witness also proved, that he knew the negroes mentioned in the will in controversy, and given thereby to the children of Mary E. Perry, and that at the date of the will they were about the following ages and values respectively, to wit: Chaney, aged about fifty years, and worth $300; Cherrylane, aged ten or twelve years, and worth $700; Dina, aged twenty-five or thirty years, and worth $800; Letty Ann, aged four years, and worth $400; and William, aged twelve years, and worth $850; and Sam, aged eight years, and worth $550.

J. Meek proved, that at the date of the will of Louisa McKinnie, she had a tract of land of about one hundred and forty-six acres, worth ten or twelve dollars per acre; that the slaves devised to William McKinnie, David, and her guardian, Michael McKinnie, were nine in number, and the land devised, and said nine slaves, were worth about nine thousand dollars. Witness further proved, that said Michael McKinnie, the legatee named in the will, was, at the date of the will, the guardian of said Louisa; that he had a family of five children, and was worth sixty thousand dollars.

The records of the Probate Court of Panola county, showing the appointment of Michael McKinnie as guardian of his nieces, Mary and Louisa, &c., were then read in evidence before the jury; and by the agreement of the parties by their counsel, it is admitted, that said records show that Michael McKinnie, now deceased, the uncle of Louisa R. and Mary E. and a legatee named in the will, was appointed the guardian of said Mary and Louisa, on the —— day of ——, 1840, and several years before the marriage of contestants, and was the guardian of said Louisa R. at the time of her death; that he had regularly rendered annual accounts to the Probate Court up to the year 1855, but that at the time of Louisa's death, no final settlement of his account as her guardian had been made; and that by his annual accounts it appeared that there was a balance in favor of his ward, Louisa, of about $1200; and that soon after the marriage of said Mary E. with B. R. Perry, said guardian had settled his guardianship account as to said Mary E., and had paid and delivered to said Mary E. and her husband, all moneys and property in his hands, as her guardian, consisting of money, negroes, &c.

—— Perry (nephew of Burwell Perry), proved, that Burwell Perry and his wife had, at the date of the will in controversy, twelve negroes and a plantation consisting of about three hundred acres; that three or four of these negroes were small; that he and his wife Mary had at that time, four children; that Burwell Perry resided, at the date of the will, and since that time, in Marshall county, about twenty-eight miles from the residence of Michael McKinnie, and that witness was the nephew of said Burwell Perry, and that said Burwell Perry was an industrious, sober man, economical, and attended to his business, as well as men generally do.

—— Bowles proved that he knew McKinnie; thought him a firm and decided man, of strong will, disposed to carry his point when excited.

Dr. —— Kinchloe proved that he knew McKinnie, and regarded him as a man of determination and of strong will, who would always attain his object, if he could.

Sandford Wilborn proved that he knew Michael McKinnie, and that he regarded him as a very firm and decided man; a man of

great force of character, and would attain his object when his feelings or his interests were involved.

Here the testimony against the will closed.

*Rebutting Testimony.*—The deposition of Mrs. E. B. Hibbler was read. She proved that she had been acquainted with Louisa R. McKinnie, from her infancy until her death; that a conversation occurred between Louisa, Mrs. McKinnie, and herself, she thinks in 1850 or 1851, a short time before Louisa went to Tennessee to school.

Mrs. McKinnie commenced telling me about Mrs. Perry's coming to her house, on a visit, and said that Louisa ran off up stairs, and that she sent for her to come down and see her sister two or three times before she came; and that when she came, she passed by Mrs. Perry, giving her her hand as she passed; and that she, Mrs. McKinnie, felt hurt at her coldness towards her sister, and went and took Mrs. Perry's babe and carried it and put it into Louisa's arms; and that Louisa did not caress it, or notice it; Mrs. McKinnie then lectured Louisa about treating Mrs. Perry with coldness, and told her that if she did not like Mr. Perry she ought to treat her sister kindly, as she was an only sister; Louisa then showed excitement, and said that Perry had married her sister for her property, and that he would kill her, Louisa, for her property; that he would destroy her; to this, the witness said she replied, "Oh Louisa!" and that Louisa then turned to her, and said, "See how he did when he took my sister off the horse; he left me sitting behind her, never so much as put me in the saddle, or put the bridle in my hand; I would have been killed right off if it had not been for Cousin Dave, who jumped down and run and caught the horse."

I was at Michael McKinnie's the day that Louisa's will was written. When we arrived at McKinnie's, Dr. Hibbler went into the parlor, and I went into the room where Louisa was. I said to Louisa that Dr. Hibbler had called to do that writing for her, and asked her if she had it all fixed up in her own mind to her satisfaction; she said "Yes," and then said "No, not exactly." I said, "Well, what is it Louisa?" She first said she wanted William McKinnie to have Amy's second son, and her uncle to have her land; and she then said, with considerable emphasis, "And I did

want to leave sister Mary's children something, provided (dwelling upon and emphasizing the word provided) I could keep it out of their father's hands." I said, "Louisa, can't your uncle Michael tell you how to do it?" She said, "I don't know; I have never said anything to him about it yet." I advised her to entail it. She said "Yes, but when they get fourteen years old, they can choose their father as their guardian." I said, "Louisa, suppose you appoint a guardian for them." She then told me to go and ask Dr. Hibbler and her uncle if it could be done lawfully. She then went on to tell me how she wanted to dispose of her property, stating it as it is in her will. I then asked her what she was going to do with her money. She said she had no money. I told her she had notes, which would be money in law. She said she wanted Uncle Michael to have all that; that she didn't want him to be in the power of Perry; that he would show him no mercy. I went and found Dr. Hibbler and McKinnie in the parlor, and told Dr. Hibbler that Louisa was ready to have her will written. I told Dr. Hibbler that Louisa wanted to appoint a guardian for her sister Mary's children, and asked him if it could be done; he said it could.

I was present when the will was written; no other person was in the room where it was written, but Louisa, Dr. Hibbler, and myself. Louisa dictated the will, specifying the names of the legatees thus : "Put it Sister Mary E. Perry, for there is another Mary Perry," but immediately said, "Oh no, she is married; put it William McKinnie and David McKinnie, sons of Uncle Michael McKinnie;" she also specified the name of Michael McKinnie, calling him Uncle Michael McKinnie, and directed what property should be given to each, and the manner in which it should be given. After the writing of the will was finished, Dr. Hibbler read it over to her, and asked if it was as she wanted it; she said it was. Dr. Hibbler then went out of the room and called Mr. McKinnie, and told him the will was written, and asked him to send for some person to come and witness it. After some time Jo. Hoke and Ben. Patton came in. Louisa took a seat at the table, and looked at Mr. Hoke and Mr. Patton, and asked them to come and see her sign it. As she took the pen and was about signing it, Dr. Hibbler said, "Stop, Louisa; do you acknowledge this to be your will?" she said she did; she then signed it in the presence of Dr. Hibbler, Mr.

Hoke, and Mr. Patton, and they signed it in her presence as witnesses.    Dr. Hibbler folded up the will and handed it to Louisa; she handed it back to him, and said, " Doctor, will you keep it for me?" he said "Yes," and took it and brought it home with him. Louisa then conversed very freely with me on subjects generally, and seemed more cheerful than I had seen her for months.    When I went to leave her, I took her hand and said to her, "Now, Louisa, don't feel bound by this will; if you want to change it, you can do it; the last will always takes precedence, and if at any time, in three weeks, or three months, or six months, you want to change it, just send me word that you want to see me, and I will understand you;" she replied, " It is just as I want it."    I told her that persons sometimes changed their minds ; she again repeated the remark, "It is just as I want it."

The will was read over to Louisa in McKinnie's presence (after it had been read to Louisa, when no one was present but Louisa, Dr. Hibbler, and myself), and Mr. McKinnie told Louisa that he would much rather she had left the property which she gave to her sister's children in the hands of Mr. Perry than in his hands, and asked her several times if it was her will that he should have charge of that property; she said that it was her will that he should have charge of it.    Mr. McKinnie said that she was making him a perpetual guardian, and that he was old and might not live long.    She said that whoever took charge of his estate could take charge of that property; she remarked that she wanted it to stay in the McKinnie family.

On the day the will was written, Louisa was in low health and declining, but she was sitting up and walking about in the room, as many as three times ; she moved a rocking-chair some five or six feet, for me to sit on; she did not seem to talk with difficulty ; she said she was in no pain, but said her breath seemed short.    I suppose it would have given her pain to talk much, or long at a time.

I was often at McKinnie's, and his conduct and bearing towards Louisa was that of a tender father to a daughter.

Louisa did mingle in society ; she visited me and my daughter, Mrs. Nelson, and Mrs. Alstons, and I saw her passing my house on the way to Panola, and to Memphis ; but she never stayed at McKinnie's longer than a few months at a time, as she was mostly

absent at school, until her education was completed; in the summer of 1854, whilst McKinnie was a widower, not many ladies visited there, though I and my daughter did, when Louisa was at home.

When I reached McKinnie's when the will was written, no one was in the room with her but a negro girl, who, as I understood, got up and went out, pulling the door after her. I did not see Mrs. McKinnie, until I was ready to start home.

Mr. McKinnie told me that he asked Louisa several times if she wanted to see her sister, and so soon as he got her consent, he started his son David after her.

Dr. E. B. Hibbler testified, that he resided about half a mile from Michael McKinnie, and had done so for the last eighteen years; that on the 26th day of April, 1855, he was at the residence of G. W. Nelson, his son-in-law, attending upon a sick child, and went by request from there to the house of Michael McKinnie, where Miss Louisa R. McKinnie, the testatrix, lived, to write her will; that Mrs. Hibbler was in company with witness; witness told McKinnie, on reaching his house, that he was in a hurry to get home, and requested him to get pen, ink, and paper, which he did; witness went into the room where Louisa was, and after being informed by her that she was ready to proceed, he wrote the introduction or caption to the will, and then asked testatrix to state over, how she wished to dispose of her property, which she did deliberately, and witness wrote it down just as she dictated it, and as it appears in the instrument now produced; that when she came to that part of the instrument where she gives a negro to her cousin, David McKinnie, she said, "Stop; David is a family name, and there is another David McKinnie: put it David McKinnie, son of Uncle Michael McKinnie;" and when she came to that part of the instrument where she gives a negro to William R. McKinnie, she stated that William was a family name also, and directed it to be put "William R. McKinnie, the son of Uncle Michael McKinnie."

That no one was present whilst he was writing the will, except Mrs. Hibbler, witness, and the testatrix; that after he had finished writing the will, witness went to the door and called Michael McKinnie, and requested him to come into the room, which he did, and witness read over the will in the presence of the testatrix, Mrs.

Hibbler, and Michael McKinnie, and when he came to that part of the will in which it is stated that the property given to her sister Mary's children is to "remain in possession of Uncle Michael · McKinnie, until Sister Mary E. Perry's children become of age or marry," Michael McKinnie interfered, and said, "Louisa, is that your will?" and she replied "it was her will," and McKinnie added he would have rather that she had left it in the hands of Burwell R. Perry; that he "did not wish to have any more trouble with Burwell Perry; that he was getting old, and she was making him a perpetual guardian;" he said no more, and witness finished reading the will. As witness had been interrupted reading the will, he proceeded to read it again, in the presence and hearing of the same persons, and when he came to the point in the will before mentioned, McKinnie said again, "Louisa, is that your will, or wish?" I raised my hand, and said, "Mac, it is her will, or wish," and he said no more, and I concluded the reading. Witness then said to McKinnie, that it was uncertain about Dr. Clark, who had been requested to call by to witness the will, being able to do so, and that Mr. Patton and Mr. Hoke, whom I had seen in the lot as I came up to the house, would answer just as well for witnesses, and requested him to call them in. He went out, and Mr. Patton and Mr. Hoke came into the room, and I said that they were wanted to witness Miss Louisa's will. The testatrix took her seat at the table and signed it, and they subscribed it as witnesses, as I have before testified; witness then folded the will and handed or offered it to testatrix, and she requested me to keep it for her. That after witness and McKinnie had gone out of the room, he said to McKinnie, that if at any time he wished to give up the trust, it would be in the power of the court to relieve him, and appoint some one else.

That witness went into the parlor, and in a short time he and Mrs. Hibbler left for home; that the testatrix was sitting up in a chair when witness first saw her that evening, and continued to do so whilst witness was there; that she appeared to be calm and collected, and exhibited a high degree of deliberation whilst dictating her will, and appeared to understand perfectly what she was doing; that the testatrix was then greatly emaciated and quite feeble, but that her mind appeared to be clear and vigorous.

· That he had known the testatrix from childhood, and had seen

her frequently during her last illness, and that at no time did he observe or believe that her mind was in anywise affected or impaired, by her disease; that he regarded her as possessed of superior intellect, and that it had been highly cultivated. That the family of McKinnie and of witness, held friendly intercourse and frequently visited each other.

That the testatrix had frequently visited witness's family, and had done so several times after her last return from school at Nashville; that witness had seen her within four or five months before her death, which occurred on the 30th of April, 1855, going to the town of Panola, and that during that time, she went to Memphis, Tennessee, and visited at G. W. Nelson's, and I saw her frequently at church; that at all times when witness saw her, she seemed to be in the full possession of her intellectual powers, though gradually sinking under consumption, the disease of which she died; that on all occasions she seemed to mingle in society, and to demean herself, as other young ladies. That he thought her more sedate and quiet than many young ladies, but he never observed any evidence of restraint or unusual reserve. That he frequently saw testatrix at McKinnie's and elsewhere, in company with McKinnie and his family, and that she was always treated as a member of the family; that Michael McKinnie always exhibited towards her as much kindness and affection, as he did towards his own children; and that he was a kind and indulgent man, in his domestic relations. That at all times when witness was in company with testatrix, she conversed freely and without restraint, though she was not a very talkative or forward girl. That he never saw any evidence of unusual or improper restraint or control over her by Michael McKinnie; that he never observed any unusual depression or elevation of spirits on the part of testatrix; that witness has been a practising physician since the year 1822, actively engaged in the practice, in South Carolina, until his removal to this State, about eighteen years since, and since then, in this State, until either two or three years since, when he withdrew from general practice. That he had practised in Michael McKinnie's family, but he was not the attending physician of testatrix, in her last illness, though he occasionally prescribed for her during that time, in the absence of her attending physician. That he never heard of her being affected

with suppression of the menses, and that he never observed any evidence of her laboring under hysteria;—that witness saw testatrix the day after the will was executed, and she was sitting up and appeared more at ease, and more cheerful, than she had for some time previous; that hysteria is frequently the result of the suppression of menses, and that the usual symptoms of hysteria are, fits of great depression, and great exhilaration of spirits, and an excitement of the imagination; that suppression of the menses is not the sole cause of hysteria; that it is produced by a variety of causes— frequently by a disordered state of the bowels—and that it sometimes occurs in males as well as females. That during the fits of hysteria, the mind is more or less affected; but that in the intervals between the paroxysms or fits, the mind was usually calm and unaffected; that at the time the will in controversy was executed, the testatrix exhibited no signs or symptoms of hysteria, nor did she at any time, when witness saw her. That testatrix died of pulmonary consumption; that her disease was gradual in its progress, and did not appear to affect her mind at all. That it is quite unusual for consumption to impair or enfeeble the mind of its subject. That it is believed, by medical men, to affect or impair the mind, if at all, less than almost any other disease the human system is subject to. That testatrix declined very gradually, and that he never knew her to have any violent paroxysms, and at the time the will was written she was able to converse and express herself clearly and distinctly, although feeble and much emaciated. That at that time her mind appeared to be as clear and bright as it ever was.

Upon cross-examination, witness stated that Michael McKinnie came to witness, at Mr. Nelson's, and stated that Louisa wished witness to go and write her will; and that in conversation, Michael McKinnie stated to witness that Louisa did not want anything said about it; that as witness did not wish to be detained, he suggested that witnesses to the will would be necessary; and that probably Dr. Clark, who was at Mr. Nelson's, could go by and witness it, and they requested Dr. Clark to do so, which he promised to do, if he could be relieved from attending his patients; that in a short time, witness and his wife got into their buggy, and went on to Mr. McKinnie's, as above stated. Witness further stated that before

the marriage of Perry, that Perry and McKinnie were on very friendly terms, and whilst Mary and Louisa were at McKinnie's, Perry visited there frequently; but after the marriage, McKinnie became very unfriendly to Perry, and disliked him very much. Witness does not recollect that he saw the testatrix for some three weeks before the day the will was written.

Joseph E. Hoke testified that he had been living with Michael McKinnie from the 1st of January, 1855, until after the death of Miss Louisa R. McKinnie; that Michael McKinnie acted towards Miss Louisa, and treated her as a parent in every respect; that he had heard said Michael McKinnie, during her illness, advising her to travel, as he thought it would be a benefit to her health, and say to her, that he was willing and ready at all times to accompany Miss Louisa to any place she wished to go; that he heard Miss Louisa, a few days before her death, ask Mr. McKinnie to send for her cousins, which he did; that he never heard Miss Louisa mention the name of her sister, Mrs. Perry; that McKinnie was uniformly kind and affectionate to Miss Louisa, and treated her more as a father would have done than an uncle.

Rev. George Stainback testified that he preached to a church, in the neighborhood of Michael McKinnie, from 1852 until 1856; that Michael McKinnie was a member of said church; that he spent many nights and days at the house of Michael McKinnie; that during the time he preached to said church, he thinks he spent at least one night in a month at his house, and on sacramental occasions, he would stay with him several days and nights at a time; that he was well acquainted with Louisa R. McKinnie; that he had had many conversations with her on various subjects; that he admitted her into the church, and baptized her; that he considered her a young lady of very superior intellect, and of fine mental culture and education; that he considered her a young lady who thought for herself, and was self-reliant, and firm in her opinions and purposes; that he had noticed the treatment of Miss Louisa by McKinnie and his family; that it was uniformly kind and affectionate; that Miss Louisa seemed to be very much attached to McKinnie and his family; that she mingled in the family of McKinnie, with visiters there, as other young ladies usually do; that he observed young gentlemen visiting her at her uncle's house,

and remembers three of them, Mr. Henderson, Mr. Clanton, and Mr. ——; that she sat in the parlor with them, and conversed, and played on the piano, and deported herself as other young ladies usually do; that he saw no evidence of restraint in her conversation or deportment; that he saw her frequently at church, and then she moved about with as much freedom as others; that in December, 1854, he met Miss Louisa, in company with her two cousins, daughters of Michael McKinnie, and David McKinnie, son of Michael McKinnie, on their way to Oxford; that Miss Louisa afterwards told him that she had spent some time in Oxford and the neighborhood, and that whilst there, she had visited at Dr. Burney's, Mr. Wendel's, and Mr. Wiley's; that some time in the early part of 1855, he delivered a message, from Mrs. Brown, of Lafayette County, to Miss Louisa, requesting her to visit her; that he delivered the message in the presence of her uncle, Michael McKinnie; and that her uncle urged her to go, but she declined, on account of her low state of health.

Geo. W. Nelson testified, that he resided, and had for the last eighteen years, within a mile and a half of M. McKinnie; that he knew testatrix; that he was frequently at McKinnie's and had opportunities to observe how the testatrix was treated; that Michael McKinnie always treated her with the greatest affection, and seemed as much attached to her as if she had been his own child; that, on the other hand, she seemed to be very much attached to her uncle and to his family; that said testatrix frequently visited witness's family, and was there on a visit about ten days before she died; that on that occasion Mr. McKinnie brought her over in a buggy in the morning, left her, and returned for her in the evening; that she was then quite feeble in body, but her mind appeared to be clear and sound; witness observed no evidences of her mind being weakened or impaired by disease; that after her return from school in Nashville, in the summer of 1854, he frequently saw her visiting; that he knew of her visiting the town of Panola, and the city of Memphis, more than once; that he knew her on several occasions to go on fishing parties with a number of young people of the neighborhood; that on such occasions her conduct and demeanor seemed to be as free and unconstrained as that of others; that she conversed freely and intelligently, and appeared to enjoy herself; that

Meek and Thornton, Exrs. *v.* Perry and wife.

he never observed anything on the part of Michael McKinnie towards the testatrix, except the kindest and most indulgent treatment; that the testatrix was possessed of a mind, superior, in his opinion, to that of most young ladies, and that it had been well cultivated; that he had seen her at church, and on such occasions she moved and mingled in company as other young ladies; that she was a quiet, sedate young lady, but he considered her firm and decided; that she gradually declined from consumption, and was feeble and much emaciated, until she died; but he saw no signs of her mind being impaired; that he knew Michael McKinnie well that he regarded him as a man of firmness and decision, but he did not consider him a harsh man; that he was extremely kind and indulgent in his family regulations; that he was a man of strong feelings, and he would call him a good hater, and a good liker.

B. F. Patton testified, that he had resided in the neighborhood of Michael McKinnie for some years; that he knew Miss Louisa R. McKinnie in her lifetime; that he considered her a girl of more than ordinary mind; that she visited his house in company with her aunt, Mrs. Michael McKinnie; that he recollected of her being there with her said aunt as many as three times; that he never observed that she was in any way restrained by her uncle, Michael McKinnie; that he knew McKinnie well; that he was a kind-hearted man, firm in his purposes, but not tyrannical.

On cross-examination, he stated that after he had witnessed the will, and had gone out of the room, Michael McKinnie said that Louisa wanted nothing said about her making a will.

William R. Caldwell testified, that he lived about four miles from Michael McKinnie; that he was well acquainted with him, and considered him a kind-hearted man, firm in his purposes, but not tyrannical or overbearing; that he had frequently been at the house of McKinnie; that McKinnie and family treated Louisa with great kindness, and she seemed to be much attached to her uncle and his family; that he had been at McKinnie's house when he had other company; that Louisa always seemed to be free and unrestrained in her deportment and conversation, though she was not a great talker; that McKinnie and family with Louisa, spent several days at his tent at camp meeting; that there Louisa mixed with the young people like other girls, and did not seem to be in any

way restrained; that he considered her a girl of more than ordinary mind and mental culture.

David Robinson testified, that he had lived within two miles of Michael McKinnie for about ten years, and knew him well, and that he considered him an upright, clever, kind-hearted man, firm in his purposes, but not disposed to exact more than he was entitled to, or to be overbearing. That, on one occasion, he was at McKinnie's, after Louisa returned from Nashville; and at the request of her uncle, she played a few tunes on the piano for witness.

H. J. Arnold testified, that he resided in the neighborhood of Michael McKinnie, and knew the testatrix, and that she had visited his house several times; that he regarded Michael McKinnie as a man warm in his feelings and attachments, firm in his purposes, but not disposed to be overbearing or tyrannical.

Robert E. Hibbler testified, that he lived with his father, within half a mile of Michael McKinnie, and had known testatrix from childhood, and had gone to school with her, and boarded at the same house with her, whilst going to school, and was accustomed to visit her, and to be in company with her, until a short time before her death; that he knew other young gentlemen to visit her frequently; on several occasions he was in company with her at her uncle's, when other gentlemen were there, and she received and entertained company, as other unmarried ladies are accustomed to do; conversed freely, and without restraint; that he recollects to have seen there, Mr. Clanton, Mr. Henderson, and a gentleman from De Soto county; that he had gone with her in fishing parties, after her return from school, and on one occasion he took her in a buggy with him to Mr. Nelson's; that her uncle Michael, and his family, always treated her with the utmost kindness, and they seemed much attached to each other; that he had often seen her at church, and knew of her visiting the town of Panola, and the city of Memphis; that he never saw any evidence of her being restrained by her uncle, but she seemed to move and bear herself, in society, as other young ladies.

Mrs. Jane Wootten testified, that she was at McKinnie's, and Louisa was telling her, in the presence of Mrs. McKinnie, that she had been, the day before, to see Mr. Strickland; and she said that,

on her way back, she stopped at Mr. Perry's. Her aunt, Mrs. McKinnie, asked her why she did not stay all night with her sister; Louisa replied, that she did not want to.

A few days before Louisa first started to Tennessee, to school, I was at McKinnie's, and Mrs. McKinnie said to me, in the presence of Louisa, that she had been trying to persuade Louisa to go to see her sister, before she went to Tennessee, and that Louisa said that she did not want to go. I said to Louisa, that she ought to go to see her sister, and be friendly with her. Louisa remarked, that she had forgiven her sister for the way she had treated her, but she never would forget her, and that she did not want to go where Burwell Perry was.

I have been at McKinnie's a good deal—as much, I reckon, as any other person in the neighborhood; have staid there as much as two days and nights at a time, at different times. I always saw him very kind and affectionate, and fatherly towards her. I sometimes thought he was more tender towards her, than towards his own children. I never saw him exhibit anything like tyrannical or masterly authority over her.

The following letters, written by Louisa McKinnie to her uncle and guardian, were then read in evidence:—

NASHVILLE FEMALE ACADEMY, June 1st, 1853.

MY DEAREST UNCLE:—I received your letter last evening, announcing the sad intelligence of aunt's death. How unexpectedly did it come upon me! When last I received a letter, she was better, and I hoped that she had entirely recovered by this time. How much I wish I could have seen her once more; but she is happy now, in the presence of God and his angels. She is with my dear mother, and father, and sisters; and should we grieve, when we know they are much better off than we are? Uncle, where are all the children now? are they still at home now, or are they with their grandmother? What doctor attended on aunt during her illness? Was Aunt Lattie there during her sickness? Uncle, do not mourn any more than possible; it is all for the best, I have no doubt, though we may not think so now. The Allwise God could not do anything, but what would be to the good of his creatures. Only a few more short years, and you will be reunited to her,

never more to part; and all of us, if we are good. This world is all a fleeting show. All is passing away. Nothing is true but Heaven. Uncle, do not distress yourself any more than possible. I would have been, uncle, better satisfied, if I could have been with her during her sickness, and tried to soothe her pain; though I suspect she was waited upon as well, or better, than I could have done. But it would have been a consolation to do anything for her. Uncle, I know that you have always done whatever you could for me, that was for my good. You have always faithfully discharged your duty, in every respect, for me. You have, indeed, been a father to me—the only father I ever knew, for I cannot remember my own father. And the reason I wrote to you, that it was too much trouble for you to come after me this summer, was because I thought it fatigued you so travelling in the stage, and I hated to see you suffer so much, that I would stay here. Uncle, I would not have you come after me, as it is; I don't think you will feel much like going among strangers in so short a time after aunt's death. But you know what is best. I am perfectly willing to stay or go, whichever you think is best. Write immediately, and let me know which I am going to do, so I can be prepared to do either. The examination will be over a month from to-day, which is the 29th, I believe. Tell all the children I want to see them all very much indeed. Tell them to be good, and kiss them all for me. Uncle, please write immediately what you intend doing. I think it will be best, though, for me to stay. Give my best love to all. Write as soon as you get this.

I remain your devoted niece,

Lou. McKinnie.

Nashville Female Academy, August 13th, 1853.

My dearest Uncle :—It is night. The girls have returned from their accustomed ride, and have repaired to the parlor to amuse themselves with play and music. I did not ride this evening, as one of the girls had a sore foot, and I remained at home with her. School will commence week after next, and I am partly glad, and partly sorry. How many pleasant thoughts rush over my mind, at the thought of seeing you all once more! How swiftly is time borne by! I cannot realize it. Our vacation has flown

Meek and Thornton, Exrs. v. Perry and wife.

by like a dream. Mr. Elliott is expected home from the North next Saturday. We have had very pleasant times this vacation. I would like more fruit, if possibly I could obtain it; but I reckon all is for the best. I received your kind letter last Friday night, and how happy did it make me, to hear once more from the loved ones at that sweet home! I did not go to sleep until two hours after every one else was asleep; for my thoughts roamed back to former days, and were prone to linger on bygone pleasures. Next week is the last week of vacation, and we will be necessarily very busy arranging our things for the session. I am not informed in respect to the room I am going to occupy next session, or my room-mates. Mr. Elliott has promised me, that he will let me have my old room that I occupied last session; and if he does not let me have it, I will have a fuss with him. I have spent a quite pleasant vacation — reading, sewing, practising, eating, sleeping, playing, and talking. How we all dread for school to commence; for then we are not allowed to indulge ourselves in such pleasures. Where do you think of sending cousin Jane and Lucy? And also cousin David? What prospect for crops have you in Mississippi? When we would ride out, we saw some corn-fields, and I never saw such corn in Mississippi. Seven girls here are Mississippians, and we have grand disputes sometimes with the Racinsac girls. There are only Mississippians and Racinsacs here. I have formed a firm resolution, which I promise you I will do all in my power to keep. I know you will be rejoiced to hear it. It is, that I am not going to read another novel; and I trust in that Power that doeth all things well. For I found that I cannot be a novel-reader, and anything else. So great an influence have these fictitious tales on my mind, that I cannot be as a rational being, under their influence. I would not be a novel-reader for the world. Such contempt have I for novel-readers, I intend reading all the histories that I can obtain, and all valuable works of the distinguished au_ thors. The teachers have commenced coming in already; by the last of next week, they will all be here. I intend being under Miss Swett. I love her very much, she is so very good. She has been as good to me, as she could have been to a child of her own. She is an old maid, and is, of course, good. We anticipate the pleasure of seeing Mr. E. from his Northern trip to-morrow evening, with

some of his teachers.   May we enjoy that pleasure.   We have not had a great deal of fun this vacation; but, occasionally, we got a nice watermelon, and slip off in the yard and eat it.   Miss Swett does not allow us to buy things from the servants; and we will have to steal off, so she will not find it out.   One evening, we all repaired down to the farthest corner of the yard, where the grass is quite tall, and when in the midst of the fun and laughing, eating three fine watermelons, we were suddenly surprised by the appearance of a snake crawling from under one of the girls.   I guess we squalled then, and run.   The consequence was, we have not been in the grass since, but continue to eat fruit some place else.   A wise resolution.   'Tis Friday night—a week since I received your letter; the girls are down in the parlor, playing.   My room-mates are in my room, and the others will come presently; two of the girls are in bed, and Bettie Mitchell and myself are writing home. She is the niece of Fanning Jones.   I love her very much.   She lives in Arkansas.   I must close my badly-written letter at present.   Give my best love to all. .Kiss the children for me, and tell them to learn fast, and be good.   Tell cousin Jane that she must answer my letter.

I remain your devoted niece,

Lou. McKinnie.

Nashville Female Academy, March 3d, 1854.

My ever dear Uncle :—Seated in this old Hall, where a thousand pleasing associations of sweet bygone hours are recalled, glancing around at the merry school girl as she communicates with loved ones at far-distant homes, how my soul rises in gratitude to the Giver of all things for the very many blessings and privileges which I enjoy above many of my race.   The school is increasing almost daily.   I think if Mr. Elliott takes many more he will have to build some more houses.   The house is almost crowded with boarders now, and if they still continue to come, that there will not be any room for them.   How my heart grows sick at the idea of leaving school in five months.   Can it be possible that I am to be no longer a wild prattling school girl.   Yes, 'tis even so.   I am to quit the old academy a young lady.   A young lady indeed !   What foolishness is implied in that little word.   'Tis all folly.   Yes, all the world is folly and

Meek and Thornton, Exrs. *v.* Perry and wife.

vanity. And all the human race are actors on the stage of life. This is the last five months of my schoolday life. How fleeting are the passing moments. 'Twas, it seems, as only yesterday, that I was an infant in my sainted mother's bosom, little thinking of nought but the pleasures of the moment; knowing nothing of the deceit and sinfulness of the outward world. They tell me that I am now spending the happy sunshine of my life. Can it be? Yes, I believe all: that in after life, when dark clouds hover over me, and all the golden cords of love that bound me to life have been broken asunder, that I will recall to my mind the golden hours of childhood, where, hand in hand with merry companions, I have whiled away the happy moments. Yes, 'twill be a green spot in my memory, ever referred to with pleasure. But I fear I weary your patience while soliloquizing on the subject of leaving school. But one more remark before closing. That this is a consolation that I am going among dear, fond, loving friends, that have ever been as good to me as my own father could have been were he alive. Yes, how sincerely I hope that through the grace of God, that I may ever prove to them loving, obedient, and amiable; a pleasure to them at all times; a solace during adversity; a pleasure during prosperity. This is ever the prayer of mine.

The spring has opened very favorably, indeed the weather is very mild, and likely to continue so for a time at least. I have been very busy during the week past, and expect to be so for some time. I will tell you what you will think rather astonishing. Well, I get up every morning before any one in my room, and immediately after the fire is made, and sometimes that is just about day. Tell cousin Jane I beat her all to pieces in that respect. Hattie Wendel has returned; she got home six hours after her brother died. How sad to think of an only brother. She was gone two weeks and two days. I pity her very much. I have a very dear friend here, that, after she graduates in June, is going to remain six months afterwards. She is very anxious to have me stay also. She proposed it to me last fall, and has been persuading me time after time since. She would not rest satisfied until I wrote to you about it. To-night she said that she would write to you herself in my letter, but she received a long letter from her home just now, and she had to stop and read it. She is a dear, sweet girl; the sweetest girl I most ever saw,

and I love her better.   She belongs to ˌthe Baptist church.   We are warm friends, always together.   I was exceedingly amused to-day to hear some one hint the idea that I must have some brothers, and policy made us such friends.   They were mistaken.   She has only two brothers, both younger than herself.   Dear uncle, what a consolation do I find in my religion ; will I ever regret taking up the Cross of my Saviour?   No.   Worlds could not buy it.   I never knew what true happiness was until I found my Saviour.   Give my best respects to all.   Kiss the children—write soon. · I remain your devoted niece until death.   Angels watch over you, is ever the prayer of one who loves you better than herself.      LOULIE.

The foregoing was the evidence submitted to the jury.

In the examination of Mrs. Hibbler, one of the witnesses of the appellants, Michael McKinnie, one of the appellants, by his counsel, asked this question: Did any conversation occur between Dr. Hibbler and Mr. McKinnie on the road from Nelson's to Mr. McKinnie's, about Louisa's making a will, or how she wanted it made ?  If yea, state it.   To which the witness answered :  "On the road from Mr. Nelson's to Mr. McKinnie's, Dr. Hibbler asked Mr. McKinnie if he knew how Louisa wanted to make her will.   He replied no, but said he reckoned he might have known if he had asked her, but he presumed she wanted to make it over to her sister's children. He said he felt a delicacy in asking her that; he thought once that he would ask her, but his feelings so overcome him that he could not do it.   See Transcript.

To the foregoing as testimony, appellees excepted, and the same was excluded from the jury ; and this exclusion is now assigned as error.

On motion of the appellants the court charged the jury as follows :

1st. The influence to vitiate a will, must amount to force and coercion, destroying free agency ; it must not be the influence of affection and attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act; and further, there must be proof that the act of making the will was obtained by this coercion, or by fraud, or by importunity, which could not be resisted ; that it

was done merely for the sake of peace; so that the motive was tantamount to force and fear, or its execution obtained by fraud.

2d. It is not unlawful for a person by honest intercession and persuasion, to procure a will in favor of himself or another person; neither is it to induce the testator by fair and flattering speeches; for though persuasions may be employed to influence the dispositions in a will, this does not amount to influence in the legal sense.

3d. The degree of importunity, or undue influence which will vitiate a will, must be such as deprives a testator of his free agency, or such as he is too weak to resist, and will render the instrument not his free and unconstrained act.

4th. The mere fact that a testator bequeaths his property, or a large portion of it, to a distant relative, to the exclusion of a nearer relative, will not vitiate his will.

5th. The giving of property, by will, to a person whom the jury may believe had no claims upon the bounty of the testator, to the exclusion of a person whom the jury may suppose had great claims upon the bounty of the testator, will not of itself vitiate a will.

6th. The mere fact that a testator bequeaths his property to a rich relative, to the exclusion of a poor relative, will not vitiate a will.

7th. A capricious partiality in the disposition of property, by will, will not of itself vitiate a will.

8th. Neither advice, nor argument, nor persuasions would vitiate a will, made freely and from conviction, though such will might not have been made, but for such advice and persuasion.

9th. If the jury believe, that the proof in this case, shows clearly and beyond all doubt, that the will in controversy was signed and published by Louisa R. McKinnie, as her last will and testament, in the presence of three competent witnesses, who at her request signed the same, as witnesses, in her presence and in the presence of each other, this amounts to full and complete proof of the execution as the law requires.

10th. And if the jury believe from the proof in the case that the will in controversy was duly executed, and that the testatrix at the time of the execution of the will was eighteen years old, and unmarried, and of sound and disposing mind, and that the will was made in the absence of any fraud, or circumvention, or undue in-

fluence, and that the will is the free, unrestrained, and voluntary act of the testatrix, then the will is valid, and the jury should find that it is the will of Louisa R. McKinnie.

11th. Before the jury can find that the will in controversy is void on account of undue influence by Michael McKinnie, they must believe from proof in the case, that the will was not only made under the influence of Michael McKinnie, but that such influence destroyed the free agency of Louisa, the testatrix.

12th. The jury are not authorized by law, to set aside the will, solely upon the ground, that Michael McKinnie was the guardian of the testatrix, at the time the will was made.

13th. The law raises no such presumption of undue influence, as will vitiate a will, from the mere fact that the testatrix was the ward of the principal legatee, at the time of the making the will.

14th. If the jury believe from the testimony, that Michael McKinnie was not present when Louisa R. McKinnie made her will, and that the will was made by Louisa, free from the influence of Michael McKinnie, and just as she wanted to make it, then, it cannot be set aside upon the ground of undue influence by Michael McKinnie.

15th. It is not sufficient to set aside a will, that the testator, through the influence of prejudice or passion, excludes a near relative from any benefit or legacy.

16th. It is not essential to the validity of a will, that the testator should know the exact value of the property disposed of by such will.

On motion of appellees the following charges were given:

1st. The heir at law of a decedent, has the same right to contest the legality and validity of the alleged will of such decedent, on the ground of incapacity, undue influence, want of freedom of will, or fraud, actual or constructive, that an individual has to contest the legality and validity of his or her own alleged deed, conveyance, contract, or gift, on similar grounds.

2d. That undue influence or fraud, in procuring a will to be made, when alleged, must be proved by the party making the allegation; but it may be established by circumstantial testimony, as well as by direct testimony.

3d. The jury, in making up their verdict, may look to the con-

tents of the alleged will, itself; to the evidence before them, by the manner in which it was written and executed, the nature and extent of the estate of Louisa McKinnie; her family and connections, their condition and relative situation to her, the terms on which she stood with them, the claim of particular individuals, and the condition and relative situation of the testatrix herself.

4th. If the jury believe from the evidence, that Michael McKinnie, for years before the will was made, exerted undue influence over the testatrix; that he caused her to be alienated from her sister, Mrs. Perry; that he used means to keep her from her sister; and that the undue influence was continued when the alleged will was made, so as to deprive her of free agency, and that the will was made under, and as a consequence of such influence, then they will find against the will.

5th. If the jury believe from the evidence, that McKinnie acquired a dominion over the mind of Louisa, so as to deprive her of free agency; and that such dominion existed at the time of making the will, and that the will was the result of said dominion, then they will find against the will.

6th. A will legally made, executed and probated, is evidence of title to property, as a deed or other conveyance is; and a will may be avoided by the heir of the decedent, on the ground of fraud, imposition, or undue influence, as a deed or conveyance may be; and a will made by a ward, over eighteen, but under nineteen years of age, in favor of a guardian with whom such ward lived, is to be set aside or sustained, on the ground of fraud, imposition, or undue influence, on the same principles that a Court of Chancery sets aside or sustains a conveyance of property, procured under like circumstances.

7th. Although the jury may believe from the evidence, that McKinnie was not present when the will was written, and that he did not personally, in the presence of Louisa, at the time, exert an influence over her; yet, if they believe from the evidence, that McKinnie, her guardian, had before that time acquired an undue influence over the testatrix, and had prevented her from holding intercourse with her sister; and that such undue influence continued, at the time of making the will, so as to deprive her of free agency,

and controlled Louisa in making the will, in favor of the guardian, then the jury will find against the will.

8th. If the jury believe from the evidence that the decedent Louisa was over eighteen, but under nineteen years of àge, when she made the will in controversy, and that she had been for months, and was when the will was made, living with her guardian, and that said decedent was then in her last illness, and that her guardian had undue influence over her; and that he procured said will to be made, as the result of such influence, and that the will is unreasonable under all the circumstances of the case, they should find against the will.

9th. The law watches with jealousy, transactions between guardian and ward, and if the jury believe from the evidence, that Louisa McKinnie made a will in favor of her guardian, whilst the relation of guardian and ward subsisted, the circumstances must demonstrate full deliberation on the part of the ward, and abundant good faith on the part of the guardian, or they must find against the will.

The assignment of errors by appellants is as follows:

1st. Said Probate Court erred in overruling the motion of plaintiffs in error, to set aside the verdict of the jury, rendered in the Circuit Court in Panola county, and to grant a new trial.

2d. Said court erred in setting aside and annulling the probate of the will on the verdict and proceedings certified from the Circuit Court.

3d. The Circuit Court erred in deciding to be incompetent and excluding from the jury, the fifth interrogatory to Mrs. Frances G. Hibbler and the answer thereto.

4th. The Circuit Court erred in giving to the jury the charges asked by the contestants, Perry and wife, No. 1, 2, 3, 4, 5, 6, 7, 8, and 9.

5th. The jury found their verdict contrary to the law and evidence.

*H. R. Miller* and *H. A. Barr* for appellants.

1st. The verdict is wholly unauthorized by the proof.

2d. The court erred in giving the instructions asked by appellees.

3d. The court erred in ruling out the answer of Mrs. Hibbler to the fifth interrogatory in chief.

The validity of the will is contested solely upon the ground that it was procured by undue influence.

The proof establishes that the testatrix was of competent age; possessed of a superior mind, which had been highly cultivated, and of firmness and decision of character.

The father of testatrix died when she was an infant, and her uncle, Michael McKinnie, was appointed guardian for her and her sister Mary.

In 1848, and before testatrix had attained eleven years of age, her mother died, and she then went to reside with her uncle and guardian, and continued a member of his family until her death, except when absent at school.

In 1848 and 1849, she boarded at Mr. Harris's, and attended a school in his neighborhood; and from the early part of 1850 until the summer of 1854, she was at school in Tennessee.

In July, 1848, her sister Mary, then not fourteen years of age, eloped with and married B. R. Perry, without the knowledge or consent of her guardian. The proof further shows that testatrix was very much displeased at the conduct of her sister; that she regarded Perry with aversion, and as unworthy of trust or confidence; and that she continued to entertain these opinions until her death.

It is proved that Michael McKinnie, although a man of firmness and decision, was characterized by great kindness of heart and warm sympathies and domestic attachments; and that at all times, he treated Louisa as one of his own children; and that she fully reciprocated his feelings, and felt deeply grateful for his care and kindness until the day of her death.

That McKinnie regarded Perry as unworthy of trust or confidence, and as an unfit associate for testatrix, his ward, is evident; but that he sought to prejudice her against her sister is not proved.

It is proved that testatrix believed that Perry had married her sister for her property; and that he was profligate, and would waste it. Soon after the marriage of Mary, her guardian settled his account, as to her, and delivered over her estate.

McKinnie was a man of ample fortune, and there is no pretence that he did not manage the estate of his ward with judgment and integrity. After her return from school, in 1854, with the advice

and consent of her guardian, she made frequent visits to her friends and acquaintances, in the surrounding country, and mingled freely in society.

It was then apparent that she was gradually sinking under consumption; but the proof shows that her mind remained clear and unimpaired until she died.

There is not a particle of proof to show that McKinnie, either by word or deed, ever did, or attempted to, influence her to make any disposition of her property.

The suggestion that he was influenced by a desire to secure her property to himself or his family, or by any mercenary motive, is not only unwarranted by, but a wanton outrage upon, the whole volume of the testimony.

The proof shows that McKinnie never uttered a word to the testatrix on the subject of her will before it was written; that he never said a word or did an act, that could, by possibility, have influenced her in making it. The idea of making a will originated with her; she selected the draftsman, and procured her uncle to go for him for that purpose.

The fact that he was the bearer of her message, when it does not appear from the proof ·that there was any one else present or convenient who could have borne it, is too trivial to deserve comment.

She tells Mrs. Hibbler that she has not consulted her uncle about it, and asks the advice of Dr. Hibbler.

She dictates the will in a manner exhibiting the highest degree of deliberation and intelligence.

Michael McKinnie is not present until after it is written, when he is called in by Dr. Hibbler.

When the will is read in his presence, and he learns that he is made trustee of the property given to Perry's children, he interposes an objection, and gives as a reason that he is growing old, and does not want to have any more trouble with Perry.

The testatrix is firm in her purpose, and the will is executed as written. The idea that McKinnie was influenced in his objection by any other motive than the one he expressed, or that there was any indelicacy in interposing it, is puerile and absurd.

The insinuation that Dr. Hibbler acted otherwise than as an

honorable and independent gentlemen, and in perfect good faith towards the testatrix, is the suggestion of a diseased imagination.

The whole proof shows that, in dictating and executing the will, the testatrix exercised her own free will, calmly, deliberately, and intelligently, uninfluenced by any one.

Under these circumstances, it would seem impossible to account for the verdict of the jury, unless they were misled by the charges of the court, or governed by that vulgar prejudice against the right to make a will, so repugnant to law and justice, and so justly reprobated by the learned judge in *Means* v. *Means*, 5 Strobhart R. 167.

There is not the semblance of foundation for the verdict, unless it be found in the mere fact that the relation of guardian and ward subsisted between the testatrix and Michael McKinnie, one of the devisees.

. The ninth instruction given by the court at the request of contestants, announces the principle that a will is *prima facie* void, because made by a ward in favor of the guardian.

Other charges, given at the instance of the same party, are artfully drawn, and so mingle things that are sufficient with things that are wholly insufficient to set aside a will, that they were only calculated to confuse and mislead, or to afford a prejudiced juror an excuse for a false verdict. Such charges are highly reprehensible, and ought not to be tolerated.

But it is to the ninth charge that we wish to direct particular attention.

By the common law of England, and by the statutes of most of the States of this Union, infants are allowed to make wills, and yet no elementary writer or reported case can be found, in which the principle contained in this instruction is held applicable to wills.

Numerous cases are to be found, in which wills made by wards in favor of guardians, and by clients in favor of attorneys, &c., have been sustained, and in which the question involved was, whether they had been procured by undue influence. *Arnold* v. *Earle*, 6 Eng. Ecc. R. 230; *Ingram* v. *Wyatt*, 3 Hagg. R. 466; *Breed* v. *Pratt*, 18 Pick. R. 116; *Crispell* v. *Dubois*, 4 Barb. S. C. R. 393.

The proposition that the principle stated is applicable to wills, seems never to have occurred to the learned text-writers on the

subject of wills, or to the learned judges of the ecclesiastical courts of England, and of the courts of America, although confidential relations are found to have existed in many reported cases; or, if it occurred to them, was deemed too absurd to merit refutation.

We admit that, transactions, dealings, and contracts between guardian and ward, where the guardian takes a benefit, are held *prima facie* void; but we insist that the principle has no application to wills.

The making of a will is not within the reason or the mischief of the principle. The object of the principle is to protect the ward in transactions or contracts with his guardian, in which he is active, and his mind opposed to that of the ward, and when he is presumed to have an advantage over the ward.

But when the ward makes his will, he performs a purely *ex parte* act, and unless it is shown that the guardian actually interfered, his mind is not opposed to that of the ward.

If the guardian exerts no actual influence, and perpetrates no fraud, the ward is amply safe. 18 Pick. R. 116.

The principle is always stated in the books as applicable to dealings, transactions, or contracts between guardian and ward, and it would be absurd to say that these terms embrace an *ex parte* act. The court gave the instruction without qualification, and as applicable to the case, regardless of the facts proved, that the guardian was not present, and did not in any manner participate in the making of the will.

The ninth instruction involves these propositions:

1st. That the making of a will is a transaction between parties.

2d. That one party may exert an undue influence over the other without saying or doing anything, and without being present.

3d. That it was incumbent on the guardian, not to prove merely, but to demonstrate, that the ward deliberated fully; *i. e.* to show the action of the ward's mind.

4th. To prove that he acted with the utmost good faith in a matter, in which the highest evidence of good faith on his part would be, that he was altogether inactive and silent.

According to the instruction, the ward alone cannot make a will, if he makes his guardian a legatee. The guardian too, must act, for it cannot be a transaction, and there cannot be abundant good faith on the part of the guardian, unless he too acts.

The guardian is treated as a party to the will, and has a duty to perform, and he must perform it, not partially, but abundantly.

The jury were in effect told that, although there was not a suspicion of actual fraud or undue influence, they must set the will aside, unless it appeared that the guardian took an abundantly faithful part in making it.

The statute gives unmarried females of the age of eighteen years, the right to make an autographic will. If such a will, made by the testatrix in this case, had been discovered after her death, and there had been no witness to tell the circumstances under which it was made, it could not have stood for a moment before this instruction, but must have inevitably been condemned; for there could not by possibility have been any demonstration of good faith on the part of the guardian, or of deliberation on the part of the ward. A minor has the same right as an adult to make an olographic will; and to restrict the former as to who shall be the objects of her bounty, is to deny, by judicial legislation, an unquestionable right.

What does the law mean by undue influence? and how, and by whom must it be proved?

"The influence to vitiate a will must amount to force and coercion, destroying free agency, . . . . it must not be the mere desire of gratifying the wishes of another, . . . . further, there must be proof that the act was obtained by this coercion, by importunity which could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force and fear." *Williams* v. *Goode*, 3 Eng. Ecl. R. 252; 3 Hagg. R. 466; 5 Strob. R. 167; 3 Serg. & R. 267; 5 Gill. & John. 269; 1 Jarman, 36; 1 Rich. R. 80; 1 B. Mon. R. 351.

In a recent English case, *Boyse* v. *Rossborough*, found in *The London Law Times*, the Lord Chancellor says, "That influence, in order to be undue, within the meaning of any rule of law, which would make it sufficient to vitiate a will, must be an influence exercised either by coercion or fraud." In the same case, it is said to be "beyond dispute, that when once it has been proved, that a will has been executed with due solemnities by a person of competent understanding, and apparently a free agent, the burden of proving that it was executed under undue influence, is on the party who alleges it, and that undue influence cannot be presumed."

And further, "In order to set aside the will of a person of sound mind, it is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence. It must be shown that they are inconsistent with a contrary hypothesis." And that "the undue influence must be an influence exercised in relation to the will itself, and not an influence in relation to other matters or transactions."

The undue influence must operate upon and control the testator at the time the will was executed. *Davis* v. *Calvert*, 5 Gill. & John. 269.

"Undue influence must result from the acts and conduct of the party supposed to have exercised it." *Leverett's heirs* v. *Carlisle*, 19 Ala. R. 80.

"Undue influence to avoid a will must be a control intentionally exercised by one mind over the will of another, so as to deprive the other of the free agency of option." *Martin* v. *Teague*, 2 Speers R. 268.

Can it be said that it is a "presumption of law," arising from the mere fact of the existence of the relation of guardian and ward, that the will in this case was procured to be made "by force and coercion, destroying free agency," and that such force was "intentionally" exercised by the guardian, as shown by his "acts and conduct," "in relation to the will itself," and that such influence "operated upon and controlled the testatrix at the time the will was executed," and that this presumption of law is so conclusive, that it is "inconsistent with any other hypothesis," than that the will was obtained by such coercion? To ask the question, is to answer it. The absurdity of the proposition is so transparent that no argument can illustrate it.

Undue influence must be proved by the party who alleges it, and by the acts and conduct of the party supposed to have exercised it, and cannot be presumed.

The authorities cited by counsel on the other side, relate to contracts, dealings, and transactions, or to cases of express fraud.

*Taylor* v. *Taylor*, 8 How. U. S. R. 183, was a case of actual fraud in procuring a deed.

*McElroy* v. *McElroy*, 5 Ala. R. 81, the question was as to

sanity; and as to this, the court says, "A will and a contract must stand, in regard to this question, on precisely the same footing."

*Clark* v. *Fisher*, 1 Paige, 171, was a case of actual fraud, practised on a man eighty years of age, and his mind rendered imbecile by disease.

*Gaither* v. *Gaither*, 20 Geo. R. 709, was the case of a will executed when the party was *in extremis*, powerfully excited in prospect of death, and not in a condition to dictate his will, or to understand it when read to him, and the facts proved rendered it improbable that he knew the contents of the will. In addition to this, there was active interference in procuring the will.

The case of *Morris and wife* v. *Stokes*, 21 Geo. R. 552, does not afford the slightest support to the proposition contended for. It was the case of a will procured by the active interference and gross fraud of the guardian from his ward, who was of feeble intellect.

The case was treated and determined as one of actual fraud, and in this view there is no difference between a will and a contract.

The judge delivering the opinion (more remarkable for diffuseness than for accuracy and precision) says, "The abuse of influence growing out of the relation of guardian and ward, is put uniformly as requiring more watchfulness than any other, and any gift from the ward to the guardian, will be more thoroughly scrutinized and sifted than any other."

There are two parties to a gift; it is not, like making a will, an *ex parte* act.

In *Beall* v. *Mann*, 5 Geo. R. 456, the circumstances raised a suspicion of unfairness, and the writer of the will took a considerable benefit under it; and the court merely say that the matter should be "viewed with extreme jealousy, and that the jury should be satisfied that the testator knew the contents of the will;" and they add, "that courts will not presume fraud, but will, under such circumstances, require strong proof of intention."

Neither the case in 7 Humph. R. 332, nor the case in 1 Dev. & Bat. 92, afford any support to the position assumed. They merely assert the general principle, that where the drawer of a will takes a considerable benefit under it, the court will be vigilant to see, that the testator knew the contents of the will, and freely sanctioned it.

*Ingram* v. *Wyatt*, 1 Hagg. Ecc. R. 384, was the case of a will made by a client in favor of his attorney, and the facts show that there was active interference by the attorney in procuring the will, creating a suspicion of fraud; and the reasoning of the judge delivering the opinion in the Prerogative Court, gives no countenance to the position that the mere relation of client and attorney, rendered the will *prima facie* void.

This case, however, was substantially reversed on appeal to the Court of Delegates, and the will was sustained. See *Wyatt* v. *Ingram*, 3 Hagg. Ecc. R. 466.

And in *Burny* v. *Bullin*, 1 Curteis Ecc. R. 637, *Ingram* v. *Wyatt* is expressly overruled. *Crispell* v. *Dubois*, 4 Barb. S. C. R. 393.

The answer of Mrs. Hibbler to the 5th interrogatory in chief, was erroneously ruled out by the court. The contestants put in issue and inquired the state of mind, sentiments, and disposition of the guardian, on the subject of the disposition of her property by testatrix, for and during a period of six years anterior to the execution of her will, and especially from the time she conceived the idea of making a will, until it was completed.

The declaration ruled out was clearly a part of the *res gestæ*. 1 Greenleaf Ev. § 108.

There is not only a preponderance of testimony against the verdict, but it is manifestly against the whole volume of testimony. There is no evidence to support it.

The circumstances demonstrate the highest degree of deliberation on the part of the ward, and the total absence of any influence by the guardian, or any one else.

*Watson & Craft* and *H. W. Walter*, for appellees.

The court properly excluded the answer of the witness, Mrs. Hibbler, to the fifth question propounded to her by McKinnie, the executor, and principal beneficiary under the alleged will. See this question and answer, on page 34 of the Abstract. By this question, McKinnie attempted to make his own statements, not made in the presence of the decedent, or of either of the appellants, evidence in his own favor. That this cannot be done, is a well-set-

tled rule of evidence. *Presley* v. *Quarles*, 31 Miss. 151; *Scaggs* v. *The State*, 8 S. & M. 726.

The verdict of the jury against the will was not contrary to the evidence; and the court, therefore, did not err in refusing, on this ground, to set it aside, and grant a new trial.

"The question here is not whether the verdict is clearly right, but whether it is manifestly wrong." *Waul* v. *Kirkman*, 13 S. & M. 599; *Prewett* v. *Coopwood*, 30 Miss. 387; *Garland* v. *Stewart & Yerger*, 31 Ib. 314.

From the testimony, and charges of the court, it will be seen that undue influence alleged to have been exercised over the decedent by Michael McKinnie, her guardian and executor, and principal beneficiary under the will, was the main ground upon which the will was assailed. "Fraud, or undue influence, in obtaining a will, is rarely proved by direct and positive testimony. It is usually made out by proof of facts and circumstances, which, when taken separately, may be very weak, yet, when grouped together, and considered collectively, may fully satisfy the mind as to the *mala fides* sought to be established." *Roberts* v. *Trawick*, 17 Ala. R. 57.

"The rule is not so stringent, as to require, that proof of undue influence should be confined to the time of the execution of the will. It is sufficient that the will was executed afterwards, under the control of such influence; and that, by reason of it, the testator was deprived of that free agency indispensable to the making of a valid testamentary disposition of his property." 17 Alabama Rep. 58; *Davis* v. *Calvert*, 5 Gill & Johns. 269; 20 Mo. R. 306.

The decedent was a mere girl when the alleged will was made. She was then but eighteen years and a few months old. She was born November 7th, 1836; and the alleged will was made April 26th, 1855. It is not contended that McKinnie, her guardian, treated the decedent with harshness, or acquired an ascendency over her by operating directly and violently upon her fears. But, from the time of the marriage of her only sister, in July, 1848, he had kept the decedent away from her sister, and from her step-father, Mr. Strickland, and from all persons that he supposed would probably remind her of her sister, or do anything to awaken or keep alive her natural love and affection for her. The decedent

never visited her stepfather after the year 1848; and Sidney Strickland, the son of her stepfather, proves, "that she never visited in his father's neighborhood, after she went to live at her uncle's, so far as he knew." Abstract, 6. And the proof shows, that she went to live at her uncle's in the year 1848.

Mrs. H. M. Anderson proves, that she lived about four miles from McKinnie's; and that if Louisa visited in her neighborhood, she did not know it. She further says, that had Louisa either visited, or been visited much, she thinks she would have known it. Abstract, 11.

Miss H. E. Barnett proves, that in 1850, she heard McKinnie say, that he did not wish Louisa to visit in the neighborhood, for the neighbors would influence her to visit her sister, Mrs. Perry. Abstract, 11.

Martha Rhodes proves, that she heard Louisa tell her sister, about the last of the year 1849, or the first of the year 1850, that she knew the reason that she did not visit her; that her uncle was opposed to it. Abstract, 7. She also proves, that about the same time her brother-in-law, Perry, rode up to McKinnie's, and called; and that Louisa was asked, by a Mr. White, why she did not go out and see him, when she replied, "that she would go, but that her uncle would be mad," and then commenced crying. Abstract, 7.

Mary Boyet proves, that in July, 1850, she heard Louisa say that she would visit her sister, if her uncle would let her. Abstract, 8.

M. E. Anderson proves, that in the spring of the year 1850, she heard Mrs. McKinnie say, in the presence of Mr. McKinnie, that Louisa never should visit her sister; and that Mary Perry never should have Louisa's property; and that Mr. McKinnie at the same time said, he would rather it should be sunk in the sea, than that Mary should have it. Abstract, 8.

Miss G. D. Harris also proves, that McKinnie, she thinks, did prejudice Louisa against Perry and his wife, by the tendency of his language and deportment towards them; and that McKinnie had very great influence over Louisa, insomuch that his will appeared supreme, with her, in everything. Abstract, 10.

Mrs. Ann Jones proves, that in the summer of 1854, she asked

Louisa if she wished to see her sister Mary; and that she was deeply affected, and replied, "yes," with tears.   Abstract, 10.

The attempt of McKinnie to prove that Louisa was alienated from her sister, but illustrates the fact that the influence of himself and wife over her, was such as to deprive her of her free agency.   Who can believe that the statement which Mrs. Hibbler proves Louisa made in the presence of Mrs. McKinnie, as to the manner in which Mr. Perry treated her, when, on meeting with Mary and Louisa in the road, Mary left Louisa, and went with Mr. Perry to be married, was the result of anything but the undue influence of Mrs. McKinnie?   See Abstract, 15.   That this statement was untrue, see the testimony of Elijah Wilborne.   Abstract, 13.

Mrs. Jane Wooten also proves, that on the day after Louisa had made the call at her sister's, which was proved by Martha Rhodes, she heard Mrs. McKinnie ask her why she did not stay all night with her sister; and that Louisa replied, that she did not want to.   Abstract, 28.   When the truth is, that Louisa, the evening before, had told her sister that she did not visit her, because her uncle was opposed to it.   Abstract, 7.

These are but some of the instances furnished by the testimony, in which the influence of McKinnie and his wife over Louisa is plainly seen.   This influence led Louisa to affect what she did not feel; and to avow feelings of indifference towards, and of alienation from, her sister, which the whole proof clearly shows were never entertained by her.   Whenever she is heard to speak seriously to or about her sister, out of the presence of McKinnie and his wife, she speaks in the language of affection and attachment; but in their presence, she generally holds quite a different language.

The letters of Louisa, introduced in proof by McKinnie, prove that she was an amiable and affectionate girl; and it is impossible that a girl, capable of writing these letters, could have felt no interest in an only sister, and her three or four small children.   Nothing but an influence depriving her of her free agency, could have prevented Louisa from visiting her sister, and finding pleasure in her society, and that of her children and husband.   It is in proof that Perry, the husband of this only sister, was an industrious, sober,

and economical man, who attended to his business as well as men generally do.  Abstract, 15.   And that, before the marriage of Perry, he and McKinnie were on very friendly terms; and that, whilst Mary and Louisa were at McKinnie's, Perry visited there frequently.   Abstract, 23.   But that, after the marriage, McKinnie became very unfriendly to Perry, and disliked him very much.  Dr. Hibbler's testimony, Abstract, 23.

The seclusion in which Louisa was permitted to decline and die, under the roof of her uncle and guardian, is a fact of great significancy in this case.   Her decline was perceptible in the fall of 1854.  Her physician, Dr. Wynn, says he visited her first on the 23d of January, 1855, and that on this visit " he found her in the last stage of pulmonary consumption."   Abstract, 11.   She lived until the 30th of April following; and during this period of time, she was confined to the house in a most critical condition, and with an absolute certainty that there was to be no improvement in her health.   Ordinarily, in circumstances like these, a person receives frequent visits, and great attention, from neighbors, and friends, and relations.   But in this instance, the proof shows that Louisa's dying couch was seldom attended by any one, but her uncle and aunt, or some one of their dependents.   Dr. Hibbler had not seen her for about three weeks before he wrote her will.   Mrs. Henson and her daughter, Amanda, lived within three or four hundred yards of McKinnie; and they only saw Louisa, during her last illness, on the day before her death, and then called upon her uninvited.   Immediately upon the death of Louisa, however, Mrs. Henson was sent for, and then saw no one in her room but Mr. and Mrs. McKinnie, family, and servants.   Abstract, 8, 9.   It rarely happens, in a Christian community, that an interesting young lady breathes her last under circumstances like these.

Hoke, McKinnie's overseer, testifies that he heard Louisa, a few days before her death, ask McKinnie to send for her cousins, which he did; but that he never heard her mention the name of her sister, Mrs. Perry.   This omission, ever to breathe the name of an only sister, was in violation alike of the dictates of nature and of the Christian profession which Louisa had made; and that it resulted from the direct agency and influence of McKinnie, who in the matter received the co-operation of his wife, cannot, it is submitted, be

seriously doubted by any one. What great wrong had this only sister inflicted upon Louisa, that she should have remained inexorable towards her through her gradual decline of months? No one knew better than Louisa, that her sickness was unto death; and had the will of another not been supreme with her in all things, her dying moments would have been watched over, and her descent into the grave smoothed by her who was her only sister and nearest of kin.

There is no proof that McKinnie ever mentioned the name of Mrs. Perry to Louisa during her protracted illness; though Mrs. Hibbler states that McKinnie told her, that he asked Louisa several times if she wanted to see her sister, and that so soon as he got her consent he started his son David after her. This declaration is not evidence, and is entitled to no weight whatever. *Presley* v. *Quarles*, 31 Miss. R. 151. Why was not Louisa consulted as to her wish to see her sister, on the day that her will was written? Had this been done in the presence of the persons before whom the will was executed, legal proof of the fact might have been made. It is very certain that Mrs. Perry did not visit Louisa during her last illness; and if she was sent for, it was not until it was seen that she was so far gone, that it would not be in her power, to talk about or to change the paper, that had been signed and acknowledged by her, as her will.

The alleged will was executed when Louisa was *in articulo mortis.* Dr. Wynn visited her on the 24th, two days before the execution of the alleged will. Her condition then is thus stated by him: " her pulse was one hundred and thirty per minute, exacerbation towards evening, with increased heat of skin; circumscribed redness or flush upon the cheeks; breathing difficult, and distressing on the slightest exertion; inspiration and expiration attended with a gurgling sound; night sweats profuse; emaciated, and debility very great; swelling of the extremities, particularly of the feet and legs; tongue red, loss of appetite." And on the last visit McKinnie asked witness as to the condition of Louisa, and witness told him she was very low, and he would not be surprised at her death at any moment, and that she could not live long. Abstract, 11, 12.

McKinnie had a motive in ascertaining from her physician the condition of Louisa. He was aware that she had made no will, and that, dying intestate, her estate would be inherited by her sister,

Mrs. Perry; and this was an event which he had determined never should take place. His language to Mrs. M. E. Anderson on this subject was, that "he would rather Louisa's property should be sunk in the sea, than that Mary should have it." Abstract, 8. On being told by Dr. Wynn that Louisa was very low, and "that he would not be surprised at her death at any moment, and that she could not live long" (Abstract, 12), McKinnie set to work to compass the consummation he so devoutly wished—the keeping of Louisa's property out of the hands of her sister and her sister's husband. As to what passed between McKinnie and Louisa about her property, there is no direct testimony. It is most evident, however, that McKinnie did converse with her on this subject, before he called upon Dr. Hibbler to write her will. He goes to Dr. Hibbler, and states to him that Louisa wished him to go and write her will, and that she did not want anything said about it. Abstract, 23. He also said to Patton, another of the subscribing witnesses, that "Louisa wanted nothing said about her making a will." Abstract, 26. Now this is proof positive that McKinnie did converse with Louisa on the subject, before the alleged testamentary paper was executed. Now, with a knowledge of McKinnie's wishes and determination on the subject of Louisa's property, and the further knowledge that he was a man of strong feelings and "a good hater" (Abstract, 26),—"a determined man, of stern and strong will, who would carry his point when he had it in his power" (Abstract, 13, 15),—we may readily conclude that he did, when conversing with Louisa about her property, bring to bear upon her his whole influence. The secrecy, too, which McKinnie inculcates about the will, is another pregnant circumstance. Louisa did not express to any one her wish for secrecy. She was but the passive instrument in the hands of McKinnie. He was the guilty agent in the transaction, and very naturally "loved darkness rather than light," his deeds being evil. It was McKinnie who procured Dr. Hibbler to write the will, and "where a will is procured to be written by a person benefited by it, or by one standing in the relation of attorney or counsel (or guardian), and who is also benefited by it, these are circumstances to excite stricter scrutiny, and require stricter proof of volition and capacity." 1 Jarman on Wills, 42. "The presumption is strong against an act done by the agency of a

party to be benefited, especially where the capacity of the testator, at the time the will was executed, was in any degree doubtful." *Beall* v. *Mann*, 5 Geo. 470.

Whilst the high respectability and great personal worth of Dr. and Mrs. Hibbler are most cheerfullly conceded, it is insisted that their testimony in behalf of the will, is greatly weakened by the circumstances of the case. They were the near neighbors of McKinnie, and it is apparent that both McKinnie and his wife had taken great pains to induce them to believe, that Louisa's own feelings prompted her to withhold from her sister her property, and to give the most of it, to McKinnie and his children. As far back as in 1850 or 1851, Mrs. McKinnie speaks complainingly to Louisa in the presence of Mrs. Hibbler, of her coldness towards her sister, and admonishes her "that if she did not like Mr. Perry, she ought to treat her sister kindly, as she was an only sister." Abstract, 15. Now that this was all affectation on the part of Mrs. McKinnie, the testimony in the case abundantly proves. But in this way Dr. and Mrs. Hibbler had no doubt been misled. Moreover, they testified under the influence of the relation which they sustain to the alleged will. Its paternity as to its execution was theirs, and without being sensible of it, this fact gave a coloring to their testimony. It is a singular circumstance, that after Dr. Hibbler had prepared the alleged will, he went to the door and called McKinnie, and requested him to come into the room, which he did, and thereupon the will was twice read over in his presence, before two of the subscribing witnesses were permitted to be called in, and before the paper was signed by Louisa. She had not asked to have him called. It would almost seem, that there was a sort of tacit understanding that the paper was to be satisfactory to McKinnie, as a condition precedent to its execution. The provisions of the alleged will were no doubt such as McKinnie knew they were to be, except, perhaps, the bequest that it contained to Mrs. Perry's children, and even this may have been sanctioned in advance by McKinnie, as a means of more certainly securing to himself and his family the balance of the estate, which was much the larger part of it. The very earnestness with which Mrs. Hibbler, when she was about leaving, urged Louisa not to feel bound by the will that had been executed, and to send for her if she should want to change it, seems to imply

an apprehension or consciousness of suspicions on her part, which it was believed the transaction itself would neither prevent nor allay. The remark of Louisa to Mrs. Hibbler, that the paper was just as she wanted it, is entitled to no weight whatever. 17 Ala. 58; 5 Gill & Johns. 269; *Taylor* v. *Taylor*, 8 How. U. S. Rep. 183, and particularly the opinion of the court on pages 205–6.

The omission of Dr. and Mrs. Hibbler to allude to Mrs. Perry when the alleged will was written, is another circumstance which shows that their feelings were enlisted in behalf of McKinnie. The unnatural character of this paper was well calculated to elicit some remark when announced for the first time to any one. But Dr. Hibbler and Mrs. Hibbler, and McKinnie, all hear its provisions stated and read over again and again, without the slightest indication of surprise, and without even asking for any explanation of the strange phenomenon presented—an only sister *forgotten and excluded out and out!*

The relation of guardian and ward which existed between McKinnie and the alleged testatrix, it is submitted, is a controlling circumstance in this case. Louisa had not attained to majority, but was only in her nineteenth year. She was living in the house with her guardian, "her only home;" and may fairly be presumed to have been liable to the influence of feeling and habits, which, in the absence of contravening evidence, would control the disposition and conduct of a youthful female thus situated. She might be moulded to almost anything, in compliance with the earnest wishes (with her, habitually yielded to, as commands) of him who stood to her *in loco parentis*. As illustrating the absolute dominion which McKinnie had acquired over the opinions and mind of Louisa, see her letter dated June 1st, 1853. Abstract, 29. In a previous letter she had expressed the wish, not to remain in Nashville that summer. In this letter she alludes to the subject, and adds: "but you know what is best. I am perfectly willing to go or stay either, whichever you think is best. Write *immediately, and let me know which* I am going to do, so I can be prepared to do either." Here is ample confirmation of the testimony of Miss Harris, that "McKinnie had very great influence over Louisa, insomuch that his will appeared supreme with her in everything." Abstract, 10.

Story, in his Eq. Jurisprudence, speaking of frauds which arise

from some peculiar confidence or fiduciary relation between the parties, remarks: "In this class of cases there is often found some intermixture of deceit, imposition, over-reaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which courts of equity act in regard thereto, stands independent of any such ingredients, upon a motive of public policy." Vol. 1, sec. 307. " If confidence is reposed, it must be faithfully acted upon, and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests, and cunning and over-reaching bargains. If the means of personal control are given, they must be always restrained to purposes of good faith and personal good." Ib. Sec. 308 ; *Taylor* v. *Taylor*, 8 How. U. S. R. 183, 200 ; *Sullivan* v. *Blackwell*, 28 Miss. R. 737. These principles apply as well to wills as to contracts or deeds. The same degree of capacity is required to make a will that is requisite to make a valid contract ; and the same freedom of will is requisite in both cases. *McElroy* v. *McElroy*, 5 Ala. 81; *Coleman* v. *Robertson*, 17 Ala. 84 ; Jarman on Wills, Vol. 1, 43 (Ed. 1855). In the case of *Clark* v. *Fisher*, 1 Paige Ch. R. 171, the chancellor, in speaking of a person of doubtful capacity, says: " Whenever a person in that situation is induced by fraud, imposition, or undue influence, to make a testamentary disposition of his property, differently from what he would, in the full possession of his faculties, the same will be set aside upon the same principle, that a court of chancery sets aside a conveyance of property obtained under like circumstances." Ib. 176.

In the case of *Gaither* v. *Gaither et al.* 20 Geo. R. 709, in which a young married son residing with his father, by his will gave a large legacy to his brothers and sisters, the Supreme Court, after approving of one of the charges given on the trial, said: "Although we agree with the court below in what it thus said, yet we think that the court might, with propriety, have gone farther, and told the jury, that they ought also to consider, the relation of father and son existing between the testator and Henry Gaither, whose children, mostly minors, were made by the will to take the half of what might remain of the estate at Mrs. Gaither's death ; and the fact, that at the time when the will was made, and for some time before, the son and his wife resided under the roof of the father, the son though

married, being still quite a young man.   Gifts by the child to the parent—the ward to the guardian—the principal to the agent—the *cestui que trust* to the trustee—and similar gifts between persons holding a similar relation to each other, labor under the suspicion of having been obtained by the donee, by an abuse of the influence which the relation gives him over the donor.

In the case of *Sullivan* v. *Blackwell*, 28 Miss. R. 737, this court refused to recognize the validity of a receipt in full given by a ward recently come of age, to his guardian, and, upon the subject, employed this language : " Courts look upon settlements made by guardians with wards, recently come of age, with distrust, and will not consider them binding unless made with the fullest deliberation and the most abundant good faith on the part of the guardian." Ib. 742.   The alleged testatrix in this case had not come of age. It is true that she had attained the age, when under a special statutory provision, she had the legal capacity to make a will.   By the existing laws of the State, no person, whether male or female, under twenty-one years of age, has power to make a will.   Revised Code, 432, art. 34.

When the alleged will was made, McKinnie had made no final settlement of his accounts as the guardian of the testatrix (Abstract, 14), and she had no accurate knowledge of the value of the bequest she was making to her guardian.   When Mrs. Hibbler asked her what she was going to do with her money, she said she had no money (Abstract, 16) ; and yet, it is an agreed fact in the case, " that by his annual accounts, it appeared that there was then a balance in McKinnie's hands in favor of Louisa, of about $1200." (Abstract, 14.)   It should be furthermore noted, that by the alleged will, the only sister, and next of kin of the testatrix, who was at the time, the mother of four small children, and in very humble circumstances, is cut off without a shilling ; a bequest of six of the least valuable of the negroes of the estate, being made to these four children, with the limitation imposed, that if these children die without bodily heirs, this property should revert to McKinnie, the guardian ; and the balance of her estate, consisting of nine valuable negroes, a tract of land of about one hundred and forty-six acres, worth ten or twelve dollars per acre, and $1200, or upwards, in money, is given to the guardian and two of his sons—he, the guar-

dian, at the time having a family of but five children, and being worth $60,000. Abstract, 13, 14.

The alleged will itself, and the conversation of Louisa when it was written, as detailed by Mrs. Hibbler, are stamped with the impress of an older and more thoughtful mind than that possessed by a youthful girl *in extremis*. We are told that the phraseology of the will was dictated by Louisa. The purpose shown, to exclude her sister from any part of her estate, and even from inheriting the slaves given to her children, should they, in the language employed, die without " bodily heirs ;" the direction that this property remain in the possession of McKinnie until Mrs. Perry's children become of age or married—the great particularity with which she designates the sons of McKinnie, to whom legacies are given—and the comprehensive character of the residuary clause of the will in favor of McKinnie, are features in this paper, which, it cannot be believed, were the uninfluenced dictation of a juvenile mind. *Taylor* v. *Taylor*, 8 How. U. S. R. 183 ; *Roberts* v. *Trawick*, 13 Ala. 68 ; *Davis* v. *Calvert*, 5 Gill & Johnson, 260 ; *Coleman* v. *Roberts*, 17 Ala. 87–8.

In view of the foregoing facts and considerations, the verdict against the will, it is submitted, was not only not plainly wrong, but obviously right and proper ; and this being so, it will not be disturbed, though erroneous instructions may have been given by the court. *Dunlap* v. *Edwards*, 29 Miss. R. 41 ; *Cantzon* v. *Dorr*, 27 Ib. 245 ; *McClanahan* v. *Barrow*, Ib. 664 ; *Corbin* v. *Cannon*, 31 Ib. 570.

But in the charges, it is insisted, there is no error. Those given on motion of the appellees are to be construed in connection with those given at the instance of the appellants ; and when construed together, it will be seen that the whole law of the case was correctly and fairly expounded.

The charges given on behalf of the appellants, state the law fully and strongly in their favor ; and by these the rights and powers of a testator, and the legal grounds on which alone a will can be invalidated, are distinctly set forth. At the instance of appellants, the jury are told, among other things, that " the influence to vitiate a will must amount to coercion, destroying free agency ;" that " though persuasion may be employed to influence the dispositions in a will, this does not amount to influence in a legal sense ;" that

" the degree of importunity, or undue influence, which will vitiate a will, must be such as deprives a testator of his free agency," &c.; that " a testator may bequeath his property to a rich relative, to the exclusion of a poor one," and " may exercise a capricious partiality in the disposition of property by will ;" and that, " if the jury believe, from the proof, that the will was made in the absence of any fraud, or circumvention, or undue influence, and that the will is the free, unrestrained, and voluntary act of the testatrix, then the will is valid, and the jury should so find ;" that, " before the jury can find that the will is void, on account of undue influence by McKinnie, they must believe, from the proof, that the will was not only made under the influence of McKinnie, but that such influence destroyed the free agency of Louisa, the testatrix ;" " that the jury are not authorized, by law, to set aside the will solely upon the ground that Michael McKinnie was the guardian of the testatrix at the time the will was made ;" that " the law raises no such presumption of undue influence, as will vitiate a will from the mere fact that the testatrix was the ward of the principal legatee, at the time of the making of the will ;" that "if the jury believe, from the testimony, that Michael McKinnie was not present when Louisa R. McKinnie made her will, and that the will was made by Louisa, free from the influence of Michael McKinnie, and just as she wanted to make it, then it cannot be set aside upon the ground of undue influence by Michael McKinnie ;" that " it is not sufficient, to set aside a will, that the testator, through the influence of prejudice or passion, excludes a near relative from any benefit or legacy ;" that " it is not essential to the validity of a will, that the testator should know the exact value of the property disposed of by such will."

Now, with the foregoing principles engrafted upon the charges given on motion of the appellees, these charges are entirely free from the slightest taint of error.   *Childress* v. *Ford*, 10 S. & M. 25.

But standing alone, it is submitted, that each of the nine charges given in behalf of the appellees, embodies a correct legal proposition, and one pertinent to the issue before the jury.

As to the first and sixth of appellees' charges, see 1 Jarman on Wills, " Undue Influence," 37; " Fraud," Ib. 41–3 ; *Clark* v.

*Fisher,* 1 Paige, Ch. 171; *Gaither* v. *Gaither,* 20 Ga. R. 709. In support of the third charge, see 1 Paige, 171, 176; *Patterson* v. *Patterson,* 6 Serg. & Rawle R. 56; *Roberts* v. *Trawick,* 13 Ala. 68; *Coleman* v. *Robertson,* 17 Ala. 84, 87, 88. In support of seventh charge, see 7 Ala. 58; 5 Gill & Johnson, 269. In support of ninth charge, see *Taylor* v. *Taylor,* 8 How. U. S. R. 183; *Gaither* v. *Gaither,* 20 Ga. R. 709, 721; *Sullivan* v. *Blackwell,* 28 Miss. R. 737. As to the rest of the charges, they are so obviously correct, that they do not require to be sustained by argument or authority.

See particularly the following cases: 21 Ga. R. 513; 20 Missouri R. 306; 7 Hump. 333; and *Jones et al.* v. *Smith et al.* 33 Miss. R. 264. That the devise to McKinnie's children is affected by the conduct of McKinnie, see *Davis* v. *Calvert,* 5 Gill & Johnson, 302.

HARRIS, J., delivered the opinion of the court.

From the record it appears that David McKinnie, the father of testatrix and of the appellee, Mrs. Perry, died in the year 1837, leaving these, his only children: Mary, now Mrs. Perry, born on the 27th August, 1834; Louisa R., the testatrix, born 7th November, 1836.

That Michael McKinnie, their uncle, qualified as their guardian in 1840. That the mother of these children died in June, 1848, and shortly thereafter, just one month, Mary, without the consent of her uncle and guardian, married Burwell R. Perry, the appellee, Louisa R. continuing to reside with her guardian.

That on the 26th April, 1855, the said Louisa being in very bad health, and in expectation of immediate dissolution from pulmonary consumption, made the testamentary instrument which is the subject of litigation here. That on the 30th April, 1855, she died, at the house of her guardian, McKinnie, and leaving an only sister, the said Mary Perry.

The will was propounded for probate by the said Michael McKinnie, the uncle and guardian of testatrix, and principal beneficiary under said will, and admitted to record in common form in the Probate Court of Panola county.

On the petition of appellees, the Probate Court directed an issue

of *devisavit vel non* to be certified to the Circuit Court of said county, to be tried there; and the jury having found a verdict against the validity of said will, in the said Circuit Court, the Probate Court entered a decree accordingly, from which decree this appeal is taken.

The errors mainly relied on by counsel for appellants are, 1st. The following instruction, given by the court on the trial below, at the request of appellees, viz.: "the law watches with jealousy transactions between guardian and ward; and if the jury believe from the evidence, that Louisa McKinnie made a will in favor of her guardian, whilst the relation of guardian and ward subsisted, the circumstances must demonstrate full deliberation on the part of the ward, and abundant good faith on the part of the guardian, or they must find against the will." And 2d. That the court erred in rejecting the answer to the fifth interrogatory, propounded on the part of appellants to Mrs. Hibbler.

The point to be considered, is the existence of "*undue influence,*" as affecting the legal capacity of the testator.

It is conceded on all sides, that where "undue influence" is established, as operating on the mind of the testator, and influencing the exercise of free volition, that, in legal contemplation, it destroys testamentary capacity. The law does not always require the production of *direct and positive proof* of the existence of acts or facts, upon which to found its judgments.

It does not always require *circumstantial proof* even, as the basis of its conclusions: deriving its principles, often, from human experience of human motive and conduct, it infers or presumes the existence of one from the proof of the other.

Indeed, the elementary writers on the law of evidence, abound with illustrations of legal presumptions, which are even conclusive and indisputable; founded in the philosophy of human experience, "and not, therefore," peculiar to the municipal law, but shared by it, in "common with other departments of science." Such are estoppels; the verity of records; the incapacity of infants and married women; the due execution of ancient deeds. The rule of law in these cases is not a rule of inference, from testimony, but a rule of protection, as expedient for the general good. 1 Greenleaf Ev. 20, ch. 4.

Meek and Thornton, Exrs. *v.* Perry and wife.

This doctrine of presumptions of law, furnishing evidence of the existence of unknown facts from the proof of others, their known concomitants, is universally and safely applied by courts of law, even where human life is involved. Thus every killing of a human being is presumed to be malicious, and consequently murder, until the contrary appears. The attempt to escape is a strong presumption of guilt, &c. These presumptions of law are sometimes conclusive in civil cases, sometimes only *prima facie*, or disputable; but in either case, courts act upon them as readily, in the absence of testimony to the contrary, as upon the most direct, positive, and conclusive proof *per testes*.

If, therefore, the law, upon grounds of great public policy, utility, or necessity, *presumes* the existence of "undue influence," from the known confidential relations of guardian and ward, client and attorney, principal and agent, physician and patient, trustee and *cestui que trust*, and others, the unknown fact, thus *presumed* in law, is just as potential as proof; as though it had been thus established by the most competent testimony.

Let us therefore inquire whether, from the known existence of the relations of guardian and ward, the law does in any, and what cases, *presume* "undue influence," or fraudulent or unconscientious conduct on the part of the guardian towards his ward, or towards others having claims on her bounty. And first, we will examine the doctrine, in reference both to its origin, and the reason upon which it is founded.

As early as the seventeenth century, the cases are numerous in which it has been held, that parties standing in the relation of guardian cannot become the beneficiaries of their ward's bounty.

In the case of *Hatch* v. *Hatch*, 9 Vez. Jr. 292, a conveyance by a ward to her guardian, was set aside on grounds of public policy. The attorney-general, after stating this rule, cited *Cray* v. *Mansfield*, 1 Vez. Sen. 379; and *Pierce* v. *Waring*, cited in the same case. *Hylton* v. *Hylton*, 2 Vez. Jr. 547, where Lord Hardwicke expresses, in strong terms, the jealousy of courts in such cases. *Osmond* v. *Fitzroy*, 3 Pr. Wms. 129; and *The Duke of Hamilton* v. *Lord Mohun*, 1 Pr. Wms. 118. The Lord Chancellor, Eldon, said, in reply, "In *Welles* v. *Middleton*, in the House of Lords, in 1785, where Lord Thurlow's decree was affirmed, all these

cases relating to trustees, guardians, attorneys, &c., were much considered, and the rule very strongly laid down by Lord Thurlow." In delivering his opinion subsequently, in the same case (*Hatch* v. *Hatch*), Lord Eldon said, "This case proves the wisdom of the court, in saying it is almost impossible, in the course of the connection of guardian and ward, attorney and client, trustee and *cestui que trust*, that a transaction shall stand, purporting to be bounty, for antecedent duty. There may not be a more moral act, one that would do more credit to a young man beginning the world, or afford a better omen for the future, than if a trustee, having done his duty, the *cestui que trust* taking it into his fair, serious, and well-informed consideration, were to do an act of bounty like this. But the court cannot permit it, *except quite satisfied that the act is of that nature*, for the reason often given." He adds, "that in discussing whether it is an act of rational consideration, an act of pure volition, uninfluenced, that inquiry is so easily baffled in a court of justice, that instead of the spontaneous act of a friend, uninfluenced, it may be the impulse of a mind misled by undue kindness, or forced by oppression. . . . And therefore," says he, "if the court does not watch these transactions with a jealousy almost invincible, in a great majority of cases, it will lend its assistance to fraud."

And although the deed had been executed for more than twenty years, in this case he set it aside.

In the case of *Morse* v. *Royal*, 12 Vez. Jr. 355, Lord Chancellor Erskine says: " One class of cases is that of contracts, that may be avoided, as being contrary to the policy of the law, which are interdicted for the wisest reasons. Of that kind is a deed of gift obtained by an attorney, while engaged in the business of the author of that gift; a deed by an heir, *when of age*, to his guardian, &c. The most remarkable case," says he, "is *Welles* v. *Middleton*, in which Lord Thurlow said, Middleton deserved to be, and under other circumstances might have been, an object of that party's bounty; but the deed taken by an attorney, while he was the attorney of the party, could not be supported without striking at the root of property." Ib. 372.

So, in the case of *Ormond* v. *Hutchinson*, 13 Vez. Jr. 47, Lord

Chancellor Erskine holds this language : " The principle upon which the court acts in these cases, in giving relief, is plain, and I think not new. The jurisdiction is most beneficial, proceeding principally upon those confidential situations in life, in respect of which this court assumes a guardianship over mankind." Commenting on the case of *Welles* v. *Middleton,* so often cited, he says : "The case had no ingredient of fraud ; but the deed was an instrument, which the *policy of the law* would not sustain ; and it was necessary to set it aside, *upon the relation of the parties. . . .* The defendants had not done anything immoral, or dishonest ; but the principle of that decision was the *policy of the law,* founded on the safety and convenience of mankind ; a shield against advantages taken by persons, in situations of confidence, *preventing acts of bounty,* which, in other situations, might have effect.

" The case of *Pierce* v. *Waring,*" he adds, "is another authority in the particular instance of a guardian. There would be no bounds to the crushing powers of attorneys, and persons having confidential communication, when no other person is present. That case did not turn upon advantage taken in the particular instance ; but upon the general rule, that the transaction should not take effect."

So also, in the case of *Wright* v. *Proud,* 13 Vez. Jr. 137, Lord Erskine, speaking of the cases of confidential relation, having just named that of guardian and ward, said : " In *Lady Sanderson's case,* all these cases were considered ; and Lord Hardwicke would not permit the transaction to stand, even after the relation had ceased, as it took place under undue influence. So, independent of all fraud, an attorney shall not take a gift from his client, while the relation subsists ; though the transaction may be not only free from fraud, but the most moral in its nature. The judgment in *Welles* v. *Middleton,* went wholly beside anything that could affect moral character."

Again, in the case of *Huguenin* v. *Basely,* 14 Vez. Jr. 299, Lord Eldon again reviews the cases, and places his decision on the ground of *public utility.* And also in *Wood* v. *Downes,* 18 Vez. Jr. 127, the same doctrine is asserted by the same chancellor.

In *Montesquieu* v. *Sandys,* 18 Vez. Jr. 313, Lord Eldon states the rule thus : " That an attorney shall not take from his client a

*gift* or reward while standing in that relation, the connection between them subsisting, with the influence attending it; though the transaction may be as righteous as ever was carried on; that the connection must, as in the instance of guardian and ward, be *bona fide* dissolved, before he can take anything beyond his regular fees."

The case of *Hylton* v. *Hylton*, 2 ·Vez. Jr. 548, was a case of guardian and ward. It was the grant of an annuity by the ward, to his uncle and guardian. The lord chancellor, Hardwicke, in delivering his judgment, decares that "where a man acts as guardian or trustee, in nature of a guardian, for an infant, the court is extremely watchful, to prevent that person's taking any advantage, immediately upon his ward or *cestui que trust* coming of age, and at the time of settling accounts or delivering up the trust, *because an undue advantage may be taken.* It would give an opportunity, either by flattery or force, by good usage unfairly meant, or by bad usage imposed, to take such advantage ; and, therefore, the principle of the court is of the same nature with relief in this court, on the head of *public utility*, as in bonds obtained, from young heirs, and rewards given to an attorney pending a cause, and marriage brocage bonds. All depends upon public utility ; and, therefore, the court will not suffer it, though perhaps in this particular instance there may not be an actual unfairness. Upon that ground I went in the case cited (*Pierce* v. *Waring*), in which I have added at the end of my note taken at the hearing of the cause, "*to be absolutely set aside, being between a guardian and his ward, just come of age, and on reason of public utility.*" See *Waring's case*, cited and fully stated in note to *Hamilton* v. *Mohun*, 1 Pr. Wms. R. 120.

I will only cite one other English case, and that is the case of *Welles* v. *Middleton*, reported in 1 Cox's Cases, 112–125 ; and also in 4 Brown's Parl. Cases, 245 (case 18). This case deserves consideration, not only from the fact that it has been cited and regarded in the subsequent cases as of the highest authority, but more especially because the reasoning employed, and principles asserted in the luminous and able judgment of Lord Thurlow, were affirmed upon a most full and thorough examination of the cases, upon appeal, by the House of Lords. This was a bill filed to set aside deeds alleged to have been fraudulently obtained from the grantor by the defendants. The court, however, in determining the case, place

their judgment not on any ground of fraud, but upon the same great principles of public policy and utility, which had been previously announced in the cases cited.

Lord Hardwicke says : " It has been argued, as if it was necessary to establish, an incompetency in this man, that rendered it impossible for him to convey; but this is not so.   There are many instances where this court is obliged to act for the preservation of mankind.  *The presumptions arising, must be at least refuted by the strongest evidence.*" . . . .  The case of *Woodhouse* v. *Shepley* 2 Atkyns, 535, was of this kind; *nothing could be fairer;* but the court decided *on general principles;* and could not permit a marriage to be the foundation of such a contract.   What is the case of expectant children, anticipating gifts by sales?  *They go upon general ideas.*  So the cases of trustees and guardians; and so of attorneys. The case of *Pierce* v. *Waring,* for instance.   The court would not have set aside the gift in that case, but because it was a *pernicious thing, that a man who had the relation of guardian, and the confidence that relation derives to him,* should avail himself of the habits of intimacy and influence (the true, and honest, and just influence, as it is in itself), he might have on the mind of an infant, or child coming of age, to obtain from him a gift of that kind.   In the case of attorneys, it is perfectly well-settled that an attorney *cannot take a gift* while the client is in his hands, nor instead of his bill.   And there would be no bounds to the crushing influence of the power of an attorney, who has the affairs of a man in his hands, if it were not so; but once extricate him and it may be otherwise.   The case of *Proof* v. *Hems,* Cas. Temp. Talb. 111, is in point; and though it was said there were other considerations in that case, *it was decided entirely on the general principle.* . . . .  I therefore set these deeds aside, *entirely* upon the grounds I have before stated, and without reference to the fairness of the characters of the defendants in any respect whatever."

Indeed, I may conclude this review of the English authorities on the *reason of the rule,* as applied to " transactions," " deeds," " conveyances," " gifts," " bounties," with the single remark, that from the earliest case I have been able to examine (*Scribblehill* v. *Brett,* 4 Brown's Cas. Pal. 144, decided in the House of Lords in 1703, on the same ground of *public utility*), I have found the current un-

broken, and the *principle* on which they rest unchanged. That principle, as clearly stated in a note to the case of *Welles* v. *Middleton*, is, " That a court of equity upon grounds of public policy will set aside any gift made by a ward to his guardian, during the continuance of the guardianship, or shortly thereafter, without any proof of actual fraud, upon the presumption of law that it was obtained by " undue influence."

The American cases, though perhaps not so numerous, are abundant, and equally clear and consistent, as to the reason and policy of the rule. They seem inclined, however, to limit its extent, so as to make the legal presumption of " undue influence" only *prima facie*, or disputable, by evidence proving to the contrary, and not conclusive.

I shall content myself on the general proposition I have been considering, to cite, as a summary of American law on this subject, the views of Judge Story in his work on Equity Jurisprudence, from which the charge mainly objected to was literally copied. The author, in the preceding chapter, had been considering the concurrent jurisdiction of courts of equity, on the subject of actual, intentional fraud. In the chapter before us, he is discussing the general doctrines of a court of equity, on the subject of *constructive frauds*. He says that, "By constructive frauds, are meant such *acts or contracts* as, although not originating in any actual evil design or contrivance to perpetrate a positive fraud or injury upon other persons, are yet, by their tendency to deceive or mislead other persons, or to violate private or public confidence, or to impair or injure the public interests, deemed equally reprehensible with positive fraud, and therefore are prohibited by law, as within the same reason and mischief as acts and contracts done *malo animo*. Although, at first view, the doctrines on this subject may seem to be of an artificial, if not of an arbitrary character, yet, upon closer observation, they will be perceived to be founded in an anxious desire of the law to apply the principle of preventive justice, so as to shut out the *inducements* to perpetrate a wrong, rather than rely on mere remedial justice, after a wrong has been committed. By disarming the parties of all legal sanction and protection for their acts, they suppress the temptations and encouragements, which might otherwise be found too strong for their virtue." 1 Story Eq. Jur. 289.

He then proceeds to "consider the cases of constructive fraud, which are so denominated on account of their being contrary to some general public policy, or fixed artificial policy, of the law." Among such cases he considers, "1st. Marriage brokage contracts," &c. After considering this class, in § 307 (1 Story, 388), he passes to the consideration of those which arise from some peculiar confidential or fiduciary relation between the parties. "In this class of cases there is often to be found some intermixture of deceit, imposition, over-reaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which courts of equity proceed in regard thereto, stands independent of any such ingredients, upon a motive of general public policy; and it is designed, in some degree, as a protection to the parties against the effects of overweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment." 1 Story Eq. Jur. 338, § 307, cited and approved in *Taylor* v. *Taylor*, 8 How. U. S. 199.

The author treats next of the relation of parent and child; then of client and attorney. Of this last relation, he says: "The situation of an attorney, puts it in his power to avail himself not only of the necessities of his client, but of his good nature, liberality, credulity, to obtain undue advantages, bargains, and *gratuities*." ...... "By establishing the principle, that while the relation of client and attorney subsists in its full vigor, the latter shall derive no benefit to himself from the contracts, or *bounty*, or other negotiations of the former, it supersedes the necessity of any inquiry into the particular means, extent, and exertion of influence in a given case; a task often difficult, and ill-supported by evidence, which can be drawn from any satisfactory sources." And, in support of this, he cites numerous cases, many of which I have already referred to. And, in addition to these, the case of *Hunter* v. *Atkyns*, 3 Myl. & Keen, 113, decided by Lord Brougham, in which the same doctrines are held. "That if a person standing in these relations [to wit, to] client, ward, or *cestui que trust*, takes a gift or makes a bargain, the *proof lies on him* that he has dealt with the client, ward, &c., exactly as a stranger would have done, taking no advantage of his influence or knowledge, &c." ....... "In a word, standing in the relation in which he stands to the other party,

the *proof lies on him*, to show that he has placed himself in the position of a stranger."

The author, in § 317, p. 354, comes to treat of the relation of guardian and ward. " In this most important and delicate of trusts,".says he, " the same principles prevail, and with a *larger and more comprehensive efficiency.*" The relation of the parties imposes a general disability to deal with each other. " But courts of equity proceed yet further in cases of this sort. They will not permit transactions between guardian and ward to stand, unless the circumstances demonstrate, in the highest sense of the terms, the fullest deliberation on the part of the ward, and the most abundant good faith on the part of the guardian."

"For in all such cases," says he, " the *relation* is still considered as having *an undue influence* upon the mind of the ward, and as virtually subsisting, especially if all the duties attached to the situation have not ceased."

*Undue influence* then, as a *presumption of law*, creating, *prima facie*, incapacity to contract, is *established*, whenever the relation of guardian and ward is established; and this upon general principles of public policy.

I am now to show that this doctrine is applicable to wills.

It would seem remarkable, in the first place, if it be true, that this doctrine has no application to wills; that in the labored research of the counsel (able, learned, and indefatigable, as they have shown themselves, in the preparation and argument of this case), they have been wholly unable to produce a *single* authority, ancient or modern, either from reported cases or text-books, showing this distinction. It would, indeed, be wonderful, if the great jealousy of the courts, for more than one hundred and fifty years, on grounds of public utility and necessity, should have led them to be thus vigilant of " undue influence" over *men*, in *health*, in the full possession of their faculties—in matters of ordinary concern, and not in contemplation of death—involving the disposition of only a part of their estates—and yet in cases usually attended with mental and corporeal debility, in view of death—involving the disposition of *all* their estate—under circumstances calculated to stimulate the last efforts of the guilty agents of such " influence"—no concern

for those subject to the dangers of this confidential relation, should have been awakened.

Let it not be forgotten, that this doctrine is one of general application to relations existing among experienced adults, as well as infant wards; *to the relation of client and attorney, principal and agent, trustee and cestui que trust;* and the force of this suggestion would seem to command respect. If it is on grounds of public policy that the law will *presume* "*undue influence*," when an attorney, or solicitor, has obtained from his intelligent adult client, in perfect health, a deed of gift, to himself and his children, for a large portion of his estate, would it not be a reproach upon its justice and consistency, should it refuse the same protecting principle of preventive aid to a female ward, and the natural objects of her bounty, in her last moments, because of the *form* of the conveyance? In the case of the adult, he lives to make complaint, to recover from the temporary incapacity which the law *presumes* to exist for his benefit, and to testify for himself to the outrage. In the other (the case of the ward), death seals the mouth of the victim, and secures immunity to the mercenary wretch, who profits by his fraud.

If the principle be irrespective of conduct or motive, of active participation or passive silence (as all the authorities, ancient and modern, with almost unbroken uniformity declare), what matters it, whether the *form* of the conveyance be by deed or will? There is no more necessity for active interference in the one case, than the other. But we are told, in the case of the *deed*, on which the eye of the grantee has never rested—of which he has no actual knowledge—in the execution of which there is no *proof* of fraud or procurement, "though the hand that receives it be ever so chaste" —*still the law will presume* that it was procured by "undue influence," and is therefore, *prima facie*, void, until the innocent grantee shall remove *by proof*, the *suspicion* which the relation of guardian to the donor, casts upon him: while, under the same relation, if you will change the *form* of the conveyance *to a will*, no such presumption arises.

As an humble agent, and votary of its precepts, I rejoice to believe that it can be shown, *upon authority*, that the law is not thus inconsistent; and to this I shall now address myself.

And first, among the elementary writers of highest authority,

not only is no such distinction taken, but the doctrine is directly applied to wills. It will be observed, by the careful reader, that in many of the cases already cited, as well as in the quotations from Judge Story, the language used is of the *most general* character, often adequate to embrace wills, as well as all other modes of conveyance; and that in no instance has the distinction been taken, or made between them, by direct statement or adjudication. On the contrary, in all the adjudicated cases, and text-writers, to which my limited time has permitted me to refer, the case of *Ingram* v. *Wyatt* has been cited and approved as one of the leading cases, on this subject, since its determination. *This* was the *case of a will,* to which I shall presently advert.

In 1 Williams on Executors, 39, 40, the author says: " In two important cases lately decided in the Prerogative Court, *wills* made by persons of sufficient capacity, but weak minds, have been set aside on the ground of ' *improper influence.*' "

The will, in one of these cases, was made in *favor of an attorney and agent of the testator ;* and for this, *Wyatt* v. *Ingram* is cited as authority.

Lomax, in his work on Executors, alluding to the same cases, and using the same language above cited from Williams, adds: " This doctrine has been much considered by the Lords of the Judicial Committee of the Privy Council, in England, in a late case; and it was assumed as a rule well established, in such cases, that the *onus probandi* lies upon the party propounding a will under such circumstances."

Mr. Greenleaf, in his treatise on the Law of Evidence, states the rule to be, " that *being under guardianship at the time,* is *prima facie* evidence of incapacity, but open to explanation by other proof," and cites for this, 12 Mass. 488, and *Burd* v. *Pratt,* 18 Pickering, 115, which was the case of *a will,* and presenting the identical question here involved. And to this case I will also refer in its order. See 2 Greenleaf Ev. 749, § 690. And again, the same author, 2 Greenleaf Ev. 730, note, it is said, " On proof of the signature of the testator, it will ordinarily be presumed that he knew the contents of the will, but this presumption may be repelled (among other circumstances) by proof of the *character* and interests of the person who wrote the instrument, and for this,

*Ingram* v. *Wyatt*, and *Paine* v. *Hall*, 18 Ves. Jr. 475, already referred to, are relied on as authority.

So in Hill on Trustees, p. 156, it is said, " Whenever, from the peculiar relations or connections of the parties, considerable *authority* or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence, by extracting from it *any advantage to himself*." . . . . . " Indeed, in some of the cases, as for instance in dealings between guardian and ward, trustee and *cestui que trust*, or attorney and client, the transaction is, in itself, considered so suspicious, owing to the near connection between the parties, as to throw the proof upon the person who seeks to support it, to show that he has taken no advantage of his influence," &c.

I will now refer to the case of *Ingram* v. *Wyatt*, so often cited in proof of this doctrine, 1 Haggard R. 384, 3 English Ecclesiastical R. 167.

In this case Sir John Nichol, in delivering his judgment in the Prerogative Court, after referring to the cases of *Paske* v. *Ollat*, 2 Phill. 323, and *Ballinghurst* v. *Vickers*, 1 Phill. 193, decided by himself, and saying that he saw no reason to depart from the opinions there expressed, proceeds to examine other authorities in support of the same doctrine. He says : " By the civil law, if a person wrote a will in his own favor, the instrument was rendered void. That rule has not been adopted *in its full extent* by the law of England, which only holds that such conduct creates a presumption against the act, and renders necessary very clear proof of volition and capacity. Nor does the law of this court determine that the act is absolutely void, even though the person making the will is the attorney and agent of the testator. The suspicion is thereby increased, and for obvious reasons ; the testator reposes confidence in his attorney, and is less on his guard against imposition, while the attorney, from skill and knowledge, is more likely to be successful in such a contrivance, and has more influence, so as to obtain a blind acquiescence. Courts of equity have in many cases set deeds aside, on account of the relation of influence in the person obtaining, and of confidence in the person granting, the benefit ; as in the cases of guardian and ward, attorney and client,

agent and principal, and the like; more particularly attorney and client, as, for example, in *Walmsley* v. *Booth*, 2 Atk. 25." After stating the circumstances of this case, he then cites the opinion of Lord Hardwicke in that case, where he said, "It had been compared to the case of defrauding young and improvident heirs, where the court relieves on the general principle of mischief to the public, *without requiring particular evidence of actual imposition upon them;* and they are cases of general concern. They also give relief, because the circumstances and situation of young persons at the time of the agreement, makes them extremely liable to imposition." ·

It will be perceived that here, *in case of a will*, the cases and reasoning applied to *deeds* are cited and relied on, without reference to the supposed distinction assumed to exist by counsel for appellants.

The court, in this case of *Ingram* v. *Wyatt*, then proceeds to cite another case of a deed to attorney from client, *Saunderson* v. *Glass*, 2 Atk. 297. He cites also *Cray* v. *Mansfield*, 1 Ves. Sen. 379; *Pierce* v. *Waring*, and *Oldham* v. *Hand*, 2 Ves. Sen. 259; all cases of deeds, where, he says, the same doctrine is recognized.

"The cases," says he, "show how extremely jealous the law is to protect the unwary against undue influence and control; when the relation of confidence exists, and where the party frames the instrument for his own advantage and benefit, every presumption arises from the transaction. . . . . . To show that such has been the doctrine of this court at all times (because it is the doctrine of common sense and of sound justice), I will state a note of a judgment of one of my predecessors, Dr. Calvert, in the case of *Middleton* v. *Forbes*. After examining the facts of this case, and remarking on the difference in England, between the practice in the Chancery Court and the Prerogative Court on this subject, he concludes thus: 'This case shows where such grounds of suspicion exist, the evidence must be clear and decisive; it shows that it is not necessary to prove fraud and imposition, for the judge gave no costs, so that fraud was not proved, yet he pronounced against the will; it shows also, that though the parties may stand in a suspicious relation, and though there may be suspicious conduct, and some deficiency of capacity, yet satisfactory evidence of the *factum*, may establish the instrument; that the instrument is not, in law, invalid.' "

After examining the facts of the case then before him, in *Ingram*
v. *Wyatt*, he concludes thus : " The court, therefore, pronounces
that the executor has failed in the proof of the will and codicil,
but as actual fraud has not been established, I shall give no costs."

From this judgment an appeal was prosecuted to the High Court
of Delegates. And afterwards, upon a petition for a commission
of review to the Lord Chancellor, Lord Brougham in refusing the
petition, said, "The great admitted fact of suspicion, arose from the
circumstance that the testator and the person to be benefited by his
will, stood in the relation of client and attorney towards each other.
This point the Court of Delegates had considered, and they were in
the result satisfied that the other circumstances of the case were
strong enough to rebut the presumption, which *necessarily arose
from that relation ; and which presumption, if they had not believed
it to be rebutted, would have given a contrary turn to their decision.*"
(See also to the same point, *Parke* v. *Ollat*, 1 Ecc. R. 273 ; *Barry*
v. *Batlin*, 6 Ecc. R. 417 ; *Darling* v. *Loveland*, 7 Ecc. R. 93,
Cases of Wills.)

The case of *Breed* v. *Pratt*, 18 Pickering, 115, to which refer-
ence has been made by Mr. Greenleaf, is equally clear and conclu-
sive, and was also the case of a will, and between guardian and
ward, and the opinion of the court is based upon the relation of the
parties.

Shaw, C. J., delivered the opinion, and on this point said : " In-
asmuch as the relation of guardian and ward, places the person and
property of the ward in the custody of the guardian ; where a will
is made beneficial to the guardian, it is to be taken as strong evi-
dence bearing upon the point of the mental capacity of the testator,
and his freedom of will and of action ; but it is to be taken as evi-
dence which may be met, and controlled by counter-proofs. It is
*prima facie* evidence of insanity, and incapacity to make a will ;
and, therefore, it is incumbent on those who would establish the will,
to show, beyond reasonable doubt, that the testator had such mental
capacity, and such freedom of will and action as are requisite to
render a will legally valid."

And so it has been held in Tennessee, in *Patton, Exr.* v. *Allison
et al.* 7 Humphries, 332, also the case of a will, and strongly in
point.

So also, in North Carolina, *Downy* v. *Murphy*, 1 Dev. & Bat. L. R. 92, in which case Chief Justice Ruffin delivered the opinion of the court.

In both these cases the doctrine is fully sustained, that when wills are executed "*in extremis*, and under suspicious circumstances, unless those suspicions *be removed* by *affirmative and plenary evidence*, that the testator comprehended the dispositions made by him, and freely sanctioned them, the jury should find against the will." These cases have reference to the fact that the drawer of the will was a beneficiary under its provisions, and *that fact alone*, in the case of *Patton* v. *Allison*, 7 Humph. was the circumstance of suspicion referred to.

In New York, as late as 1848, in the case of a will in favor of a physician, *Crispell* v. *Dubois*, 4 Barbour's Supreme Court R. 393, the case of *Ingram* v. *Wyatt*, is cited, and the opinion of Lord Brougham, just quoted, approved.

The last case to which we shall refer, is a very recent case decided by the Supreme Court of Georgia, *Morris and wife* v. *Stokes*, 21 Georgia R. 552. This was the case of a will by a ward, in favor of his guardian. Chief Justice Lumpkin, in delivering his able judgment in this case, considers the very question made here, as to the distinction supposed to exist between deeds and wills, and determines that "these adjudications are put upon the ground of public policy." He cites, and comments with great force and clearness, upon the English cases, as to deeds affected by these confidential relations, and pertinently asks, "was not this influence existing *much more potentially* while the ward of Lewis was still a minor, and the relation of guardian and ward still subsisted? Will a deed made even after the ward has come of age, be set aside, and a will made during infancy not be questioned? Counsel have submitted no authority to justify any such distinction. I have met with none." On the contrary, he cites *Ingram* v. *Wyatt*, as evidencing the application of the doctrine to wills as well as deeds.

I therefore hold that the court did not err when it instructed the jury, "that the law watches with jealousy, transactions between guardian and ward; and if the jury believe from the evidence that Louisa McKinnie made a will in favor of her guardian, whilst the relation of guardian and ward subsisted, the circumstances must

demonstrate *full deliberation* on the part of the ward, and *abundant good faith* on the part of the guardian, or they must find against the will."

In our own court, in the case of *Sullivan* v. *Blackwell*, 28 Miss. R. 742, the spirit and even language of the doctrine above quoted from Judge Story, was applied to the case of a receipt executed to the guardian by the ward recently come of age. Though the point was not distinctly made in the case, yet the court said: " Courts look upon settlements made by guardians with wards recently come of age, with distrust, and will not consider them binding unless made with the fullest deliberation, and most abundant good faith on the part of the guardian."

2. Only one other point remains which, in my judgment, seems to require consideration; and that is, the exclusion of the declarations of the guardian made to the scrivener, Dr. Hibbler, who drew the will.

Upon this point I have found myself much perplexed, as other inquirers have been before me, in the application of the rules, which elementary writers have labored in vain to render of practical and easy appliance in all cases. Indeed, it has been truly said, and seems to be admitted, both by the judges, in the reported cases, as well as the text-writers, that " where declarations are admitted as part of the *res gestæ*, there is hardly any distinct rule as to what will constitute the *res gestæ* which will support such declarations." (Parker, C. J.) *Pool* v. *Bridges*, 4 Pick. 378. And in *Allen* v. *Duncan*, 11 Pick. 309, Shaw, C. J., referring to the case just cited, says: " That it is difficult to lay down any precise general rule as to the cases in which declarations are admissible, as part of the *res gestæ*, and when they must be rejected, as the mere assertions of the party." Mr. Greenleaf, in concluding section 108, uses the language quoted by counsel, as authorizing the admission of these declarations; but in the previous part of the same section, he admits the " difficulty, if not impossibility," of bringing this class of cases within the limits of particular rules; and cites to his relief, in the effort, the two cases above referred to, and other English cases. And the learned, able and laborious annotators on Mr. Philips' work on Evidence, after a most extensive collection and review of the cases, English and American, on this subject, say: "It

is difficult to lay down any precise general rule as to the cases in which declarations are admissible, as part of the *res gestæ;*" and cite for this, also, C. J. Shaw and C. J. Parker, in the cases above referred to from 4 and 11 Pickering.

The inherent difficulty of the subject, and the necessity of referring the decision of each case to its own particular circumstances, without the aid of " any precise, general rules" to guide us in our judgment, would seem to commend, in these cases, a very cautious exercise of the revising power: for tribunals whose advantages are greatly superior to ours, in the ascertainment and minute comprehension of *those particular circumstances* which are regarded as giving illimitable variety and difficulty, on this subject, to the rules of decision, which should guide them, it would seem safer to *defer much* to their discretion.

Mr. Greenleaf, vol. 1, p. 137, § 108, in discussing this subject, says: " The affairs of men consist of a complication of circumstances, so intimately interwoven, as to be hardly separable from each other.   Each owes its birth to some preceding circumstances, and in its turn becomes the prolific parent of others; and each, during its existence, has its inseparable attributes, and its kindred facts, materially affecting its character, and essential to be known, in order to a right understanding of its nature.   These surrounding circumstances, constituting a part of the *res gestæ,* may always be shown to the jury, along with the principal fact; and their *admissibility is determined by the judge, according to the degree of their relation to that fact,* and in the exercise of his sound discretion; *it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description.*   The principal points of attention are, whether the *circumstances and declarations* offered in proof were *contemporaneous* with the *main fact* under consideration, and whether they were *so connected with it, as to illustrate its character.*"

The admissibility of evidence is a question always addressed to the discretion of the court.   " In determining what evidence shall be admitted and weighed by the jury, and what shall not be received at all, a principle seems to have been applied, similar to that which distinguishes between conclusive and disputable presumptions of law, namely, the experienced connection between the situation

of the witness, and the truth or falsity of his testimony. Thus, the law excludes, as incompetent, those persons whose evidence, in general, is found, more likely than otherwise, to mislead juries." 1 Greenleaf, 439, 440, § 327.

And this is the *principle* by which courts of justice have regulated their judgments, and established general rules, as to the admissibility of evidence.

Keeping this principle, which lies at the foundation of all these rules, in view, I shall now proceed to extract, as far as possible, from the mass that is before me, *the substance* of the rules that seem to be *established*, in relation to the admissibility of declarations as part of the *res gestæ*.

"If the declarations are merely narrative of a *past occurrence*, they are inadmissible as proof of such occurrence." 1 Greenleaf, § 110; and 2 Pothier, Mr. Evans' Appendix.

If they are not the "natural or inseparable concomitants of the principal fact in controversy," and so connected with the hypothesis they are introduced to establish, as to induce the belief that they are the mere result and consequence of the coexisting motives they are introduced to establish, they are equally inadmissible. 1 Greenleaf, § 100, p. 129; § 108, p. 137; 2 Pothier, 217.

Whatever expressions may be thus fairly regarded as naturally suggested by the coexisting motive, influencing the conduct under investigation, and obviously referable *only* to that motive and conduct, will be received in evidence.

Declarations, to be received in evidence as part of the *res gestæ*, "must have been made at the time of the act done, which they are supposed to characterize, and must have been well calculated to unfold the nature and quality of the facts they were intended to explain, and so to harmonize with them, as obviously to constitute one transaction." Hosmer, J., in *Enos* v. *Tuttle*, 3 Conn. R. 250. And this is the rule adopted by Cowen & Hill (2d vol. Notes to Phil. Ev. 586) "as the best" (note 444), and cited in note 2. 1 Greenleaf, 138, with many other authorities.

These declarations, as part of the *res gestæ*, are only admissible in "subordination to other general rules, which govern in the admission of testimony generally." "All questions of evidence must be considered in reference to the particular circumstances

under which it is offered." 2d vol. of Cowen & Hill's Notes, 601, citing 5 Barn. & Ald. 223, per C. J. Abbott.

These rules have reference to the action of the court in the exercise of its discretion, and are intended to aid the judge in determining whether, "from the experienced conviction," between the situation and circumstances in which this guardian was placed at the time the declarations were made, and human conduct and motives under like circumstances generally, his declarations were most likely the natural or inseparable attendants of innocent ignorance, or cunning falsehood.

With this principle before us, let us inquire : First. What is the main fact in this case, to which the declarations here ruled out, by the court below, are naturally referable ?

The record must afford the answer. The subject, or main fact for investigation, to which these declarations are applicable, if at all, must be the conduct and motives of the guardian, in relation to the execution of the will in his favor.

Second. What are the declarations? The record shows that while this guardian was going with the scrivener, Hibbler, to the place where the will was to be executed, *Hibbler asked him* "if he knew how Louisa (the testatrix) wanted to make her will?" He replied, "No ;" but said he *reckoned* he *might* have known if he had asked her; but he *presumed* she wanted to make it over *to her sister's children.* He said, "he felt a *delicacy* in asking her ; that he thought once that he would ask her, but his feelings so overcame him that he could not do it."

Third. Were these declarations cotemporaneous with the main fact, and well calculated, obviously and naturally, to illustrate or prove his innocence, fairness, or abundant good faith, in relation to the provisions of this will? Or, on the contrary, do they not rather, under the circumstances in proof, more naturally and obviously suggest contrivance, design, and fraudulent pretence of good faith towards his ward, which his conscience whispered him he ought to have observed.

Were they "cotemporaneous with the main fact, and so connected with it, as to illustrate its character?"

The guardian and uncle was an old man, of very abundant means, surrounded by agents at his command, whom he could have

readily employed as messengers, to send for Dr. Hibbler to write this will. Yet he went himself. Why? He stated to Hibbler when he found him, that "*Louisa* wished him to go and write her will;" . . . . . "that *Louisa* did not want anything said about it." Why this particularity? Why this concealment? Was it consistent with good faith on the part of a guardian? Does it naturally excite no feeling of distrust? He was afterwards (on their way to the place of its execution) *asked by Hibbler*, "If he knew *how* Louisa wanted to make her will?" *Why such a question?* She had an *only sister—only near* relative. Without some suggestive circumstance, creating a doubt in Hibbler's mind, the question was as unnatural as the answer. Let us see, now, if the character of *this answer*, is the natural, inseparable emanation of truthful sentiments, or is it unnatural, separable, and feigned? Upon the supposition that he *did know* "how Louisa wanted to make her will," and in view of the *utter destitution* of "delicacy" subsequently evinced, when the will was read to him; what *so natural* as that the wretched spirit of avarice, which allowed him to accept the bounty of his dying niece, *to the exclusion of her only sister*, should have prompted him to feign ignorance of her wishes, and to desire secrecy, until *death* should seal the deed. He was *interrogated;* the declaration was not a spontaneous expression of natural feelings or sentiments accompanying, or even in reference to, any act or conduct of his, but it was *drawn from him, in invitum*. He was asked if he knew how Louisa wanted to make her will; he replied "No!" but said he *reckoned!* he *might* have known, if he had asked her, but *he presumed* she wanted to make it over *to her sister's children!* *Why this presumption*, if he knew nothing; if he had not conversed with her; if he were *really* ignorant of her feelings and intentions? Why this unnatural presumption?

"*He felt a delicacy*" in asking her. " He thought once, he would ask her, but his feelings so overcame him, that he could not do it."

Let us further test, by the proof in the case, how far these declarations tend to induce the belief, that they were the "natural or mere result and consequence, of the supposed innocent, coexisting motives, which they are introduced to illustrate or prove. He speaks to Hibbler, in answer to his question, in the language of a tender-hearted woman. Was this *natural to him?* The record

says not; but, " stern"—" determined"—" strong will"—" firm"—
" great force of character." " But he *felt a delicacy* in asking
her ;" " his feelings so overcame him that he could not do it." And
yet when, in the presence of his dying niece, that will was read to
him, announcing, for the first time, the astounding fact that *he* was
to be the principal and almost exclusive beneficiary of her bounty,
to the exclusion of the indigent sister, that delicacy did not attend
him.  He not only withstood its influence, but his *"feelings"* did
not even so far overcome him, as to repress a rude " interference"
with the wishes of his niece and ward, at the *repetition* of which
the kind heart of his friend Hibbler revolted, and spoke out  " I
raised my hand," says he, in his testimony, " and said, Mac, *it is*
her will or wish."

To my mind these declarations, under the circumstances, are not
to be regarded as belonging to that class of " verbal acts" which
are admitted in evidence as facts, such as the exclamations accom-
panying pain or injury ; the expressions of joy or grief, or surprise
or emotion, naturally attending, and emanating from, these exciting
causes, and referable to it alone ; or to the casual, unpremeditated
utterance of the intentions, motives, or feelings, which give rise to,
or accompany an act.

In all these cases, the declarations which the law regards as
" verbal acts," are the natural effusions of one who speaks upon an
occasion when there is no temptation to speak falsely.

These declarations, to be admissible, should not only be contem-
poraneous with the conduct in question, and so connected with it
as to show its true character, but they must also be the natural
effusions of a mind, under no existing temptation to speak falsely.

Declarations thus made, carry with them, to every mind, the
sanction and assurance of truth; and hence are admitted as original
evidence.

These declarations have no inseparable concomitant act, with
which they coexist, and from which they naturally flow.   They are
independent, original, forced from all necessary or natural convic-
tion, by a direct question, which compelled him to confess his com-
plicity, or to feign entire ignorance.

If their admissibility is to be determined by the judge, accord-
ing to the degree of their relation to the principal fact, and in the

exercise of his sound discretion, as Mr. Greenleaf says, then I cannot doubt that such discretion was properly exercised, under the circumstances of this case.

Decree affirmed.

HANDY, J., dissented as follows.

Not being able to concur in the views of this case taken by the majority of the court, I will very briefly state the reasons for my dissent.

The rule declared by the ninth instruction, given at the instance of the appellees, is, that when a will is made by a ward in favor of his guardian, whilst the relation of guardian and ward subsists, the circumstances must demonstrate full deliberation on the part of the ward, and abundant good faith on the part of the guardian, or the will must be condemned as having been obtained by undue influence by the guardian.

I consider this instruction as stating a rule not applicable to the case, and calculated to prejudice the validity of the will.

The rule has been established by numerous decisions, that in all contracts, dealings, and transactions between parties who stand in the relation of trust and confidence, and especially of dependence the one upon the other, a benefit acquired by the party standing in the relation of trustee will be taken, *prima facie*, to have been obtained unfairly, or by undue influence; and the party claiming the benefit will be required to show that the transaction has been conducted with fairness and good faith. This rule has been frequently applied to dealings and transactions between trustee and *cestui que trust*, attorney and client, guardian and ward, and to many other cases, where especial trust and confidence were reposed, by the party from whom the benefit was derived, in the recipient of it, and where a state of dependence for counsel and direction, by the former upon the latter, subsisted. In all such cases, it has been sanctioned as a rule of public policy, best calculated to protect the rights and interests of the unwary and confiding, against those whose positions enabled them secretly, and almost beyond the possibility of detection, to take advantage of those who were subject to their influence, and whose rights were in their keeping. Hence, it has been established as a rule of expediency, tending to promote

the ends of justice, that such dealings or contracts shall not stand, unless sufficiently explained to show that no undue advantage was taken of the person from whom the benefit was obtained; and it is expressly held as an exception to the rule, that fraud and bad faith are not to be presumed.

The rule does not, however, prohibit such transactions, nor render them absolutely void, but only requires that their fairness shall be explained by the party who has conducted them; and it is founded on the just reason, that such a person ought to be able to show the circumstances and the propriety of dealings and transactions, to which he was a party, if, indeed, he has acted with propriety in them. Hence, nearly all the cases in which the rule has been applied, are those of dealings, transactions, or contracts, directly between the trustee, the beneficiary, and the party from whom the benefit proceeded. In other cases, it has been applied where the beneficiary was the procurer of the benefit, the adviser or draftsman of the wills, or other papers, conferring the benefit— standing in a confidential relation to the other party, and therefore subjecting him to the same presumption of undue influence which applied to cases of direct dealings, and transactions of business, between parties occupying the relation of trust and confidence. We can readily recognize the reason and justness of the application of the rule to all such cases. They are transactions to which the beneficiary was a party; and if fair, were susceptible of being shown by him to be so. It was his duty, and within his power, in view of the rule governing his dealings, to take such steps in the transactions, as to be able to show that he acted with all due regard to the rights and interests of the party with whom it was conducted—to remove all suspicion as to the fairness of his conduct.

But when we attempt to apply the rule to cases where the parties have not dealt together, where no transaction has taken place between them, or where the beneficiary has not been active in procuring the act which conferred the benefit, it appears to be evident that the force of the rule fails. It cannot apply, because, not being a party to the transaction which conferred the benefit, it cannot with reason be expected, that, with any precaution, he could be prepared to explain the circumstances attending it. He

cannot be required to explain a matter in which he had no participation, and which may have been done wholly without his knowledge. To apply the rule to such a case, would be almost inevitably to condemn the act absolutely, and that upon the unjust reason, that he acted unfairly in a matter to which he was not a party.

The most abundant good faith, on his part, was to have done nothing, and known nothing in the matter. Yet, in such circumstances, it would generally be impossible for him to show the facts attending the act, or which led to it; and hence his very good faith would render the act fraudulent and void, in legal presumption—which presumption must stand, because his very good faith renders it impossible for him to remove it by explanation. It appears to me, that any such rule cannot be justified by any reason of public policy. It is in opposition to the just rule, that fraud is not to be presumed. It would be to presume fraud, contrary to all principle; and, where the presumption must prevail from the necessity of the case, against innocence and the most perfect good faith, because of the impossibility of its being rebutted by reason of want of knowledge of, or participation in, the act done. And the rule, applied to cases of this sort, would lead to the most unjust and unreasonable consequences.

Take the case of an autographic will, or of one attested by witnesses, who are all dead at the time of the testator's death, made by a ward, and containing valuable bequests to his guardian, who is also nominated in it as executor. After the testator's death, the will is found among his valuable papers, and as such, comes to the hands of the executor. It is his duty to propound it for probate. No knowledge of, or agency in, its preparation or execution, on his part, is shown; and yet he is met with the presumption, that it was procured by him by undue influence, which must be removed, or it stands condemned. How is he to explain it? Must he prove that he was not present, and did not participate in the act when it was done? That might be true and yet it would not remove the presumption; for he *might have* artfully and secretly pre-arranged the whole matter, absenting himself at the time of the execution of the will, to avoid suspicion. Something further must be shown; and that could not stop short of proof, that both in the matter of the

execution of the will, and in all his conduct towards the testator, he had exerted no undue influence. It would, indeed, be most extraordinary, if such proof could be made, however unexceptionable may have been his entire conduct, and however free and unbiassed may have been the action of the testator, and however strong may have been the feelings of affection and confidence on his part, which dictated the bequest. And this is the case presented by this record.

But suppose that the guardian was entirely ignorant of the fact, that the will had been executed. It would be impossible for him to show that, and most improbable that he could show the circumstances attending the execution of the will, demonstrating that it was the free and unconstrained act of the testator. In vain would he protest his ignorance of the entire matter, and hold up his general conduct as evidence of the propriety of his course. He cannot prove his ignorance, and very likely may not be able to prove his absence or want of participation in the matter. His very freedom from suspicious conduct, therefore, works the condemnation of the instrument, in rendering it impossible for him to explain the circumstances of its execution, of which he knew nothing. It is manifest, that such a result would be most unjust, and that the rule of presumption, and of the necessity for explanation, could not apply to such cases; because a will is the *ex parte* act of the testator, and *not a dealing, transaction, or contract, between* him and his guardian, in which the latter could be presumed to have had any agency. And yet such is the effect of the rule if it is applied to wills.

It is said, that the rule declared in this case is applicable to wills upon a high principle of public policy. But it appears to me to be clear, that the reason of public policy, upon which the rule is founded, has application only to dealings and transactions, in which the trustee or beneficiary is a participant; and that, to extend it to other cases, would be to presume a man guilty of fraud in a matter in which he is not shown to have had any agency. It cannot be that any reason of public policy could warrant so unjust and unreasonable a rule.

In most of the cases in which the rule has been held, the trustee has been a party to the *deed, dealing, transaction,* or *contract.* In

others, he has been an active participant in the execution of the instrument—its draftsman or procurer with full knowledge of its contents. It is with reference to such circumstances that it is said, in all the cases, that such deeds, transactions, dealings, or acts, are presumed to be invalid on the ground of public policy. This will be manifest, from an examination of the numerous cases cited to sustain the rule held in this case. And though, in many of the cases relied on as sustaining the application of the rule, to the case of a will made by a ward in favor of a guardian, there are loose observations which would include such a will, within the rule applicable to dealings and transactions between such persons, yet they are not cases of wills of wards, in favor of guardians; and in no such case, has the rule been held, that the will must be presumed to be fraudulent, from the mere fact of the relation of guardian and ward subsisting at the time of its execution, unless *Ingram* v. *Wyatt*, 1 Hagg. be such a case, and that has been expressly overruled in *Barry* v. *Butler*, 1 Curteis, 417. The loose *dicta* contained in the cases, certainly should not be held to establish a rule so unreasonable and unjust, as that declared in the instruction under consideration, and to give it the force of settled law.

The rule cited from 2 Greenleaf Evid., upon the authority of the cases *Stone* v. *Damon*, 12 Mass. 488, and of *Breed* v. *Pratt*, 18 Pick. 115, has no application to this case. Those were cases of *non compos*, where a guardian had been appointed; and it was held to be incumbent on the guardian, who was the legatee, to show that the testator was capable of making a will; because having been once *non compos*, and being then under guardianship, the presumption of mental incapacity continued, until removed by proof.

It appears to me, therefore, to be clear, that this presumption cannot apply to a case like this; and I think that the true rule is, that the mere existence of the relation of guardian and ward, together with the fact, that the guardian is a beneficiary under the will, are circumstances to be considered by the jury, as tending to show undue influence on the part of the guardian in obtaining its execution, provided there be other evidence tending to show undue influence by the guardian, continuing at the time of its execution, destroying the free agency of the ward, and tending to show that the will was not the unconstrained act of the ward, and her free and

voluntary will. But the existence of that relation is not sufficient of itself to condemn the will, or to render it incumbent on the guardian, to show that no undue influence, fraud or constraint, was employed by him in obtaining its execution.

The other question decided, is the incompetency of the declarations of McKinnie, the guardian, made to Dr. Hibbler.

It was proposed by the propounder of the will, to offer in evidence the declarations of McKinnie, made to Dr. Hibbler at the time McKinnie went for Hibbler to write the will, and on the same day on which it was written, whilst Hibbler was on his way to McKinnie's house to write the will; in which McKinnie stated, in reply to an inquiry of Hibbler, whether he knew how the testatrix wished to make her will; that he did not, but that he reckoned he might have known if he had asked her, but that he presumed she wanted to make her property over to her sister's children, &c.

The object of this evidence was to rebut the circumstances relied on by the contestants of the will to show that its provisions were contrived by McKinnie, and pre-arranged by him before he went for Hibbler to write it; and that his applying to Hibbler to write the will, was but carrying out his purpose of securing the bulk of her property to himself, which he had planned, by means of his undue influence over his ward. And the question is, are these declarations admissible for this purpose?

The rule upon the subject is stated by Greenleaf to be, that "declarations" of a party, whose conduct is material to the controversy, "made at the time of the transaction, and expressive of its character, motive, or object, are regarded as verbal acts, indicating a present purpose and intention, and are, therefore, admitted in proof, like any other material facts." 1 Greenl. Evid. § 108. The learned Mr. Evans states the rule thus, "whenever the demeanor of a person at a given time, becomes the object of inquiry, his expressions, as constituting a part of that demeanor, and as indicating a present intention and disposition, cannot properly be rejected as evidence." 2 Pothier on Oblig. by Evans, App. No. 16, § 11, p. 217. And again, he says, "whatever expressions may be fairly regarded as resulting from contemporaneous motives, acting upon his mind, and influencing his conduct, should be received in evidence." Ib. "In questions of fraud and *bona fides*," says the

same author, "an adequate judgment can in general only, be formed by having a perfect view of the whole transaction, which, of course, includes the conversation which forms a part of it ; and, according to the phrase usually applied to this subject, the language which is used on any occasion, forms a part of the *res gestæ.*" Ib.

Applying these rules to the facts of this case, I think it clear that the declarations in question were admissible.

The matter in which McKinnie was engaged when the declarations were made, was the preparation and execution of the will ; and the important question in the suit was, what were his purpose of mind and agency in procuring it, and the influence he exercised in obtaining its execution. These constituted the *res gestæ*, the matter then being carried on, and the subject of controversy. The true character of the transaction, and of McKinnie's conduct in it, must be ascertained from all that transpired at the time the business was being carried on. The hypothesis of the contestants of the will is, that he had pre-arranged its provisions, and was but carrying out his own wishes and purposes in having it written by Hibbler, his confidential friend and neighbor. The act of having the will written was begun, and McKinnie and the draftsman were together, on their way to his house where the testatrix was, to complete it. McKinnie was carrying out his alleged purpose of having the will written to suit himself, and to secure the property to himself. The question, then is, what were his designs, his feelings, and the state of his mind, whilst they were thus engaged in the business. These must be collected from all that he did and said whilst in the prosecution of the design. His declarations at the time touching the matter in hand, are inseparably connected with his acts, *they are facts* expressive of the character of the act, and of his motive, state of mind, and feelings in regard to it. They were made to his friend, whom he had selected, as is alleged, to carry out his purpose, and while he was in the very act of having it accomplished. They were, therefore, part of the very transaction then being carried on, and were admissible in evidence upon the same principle as his conduct and acts at the time. This appears to be evident from the rules as stated by the text-writers ; and it is illustrated by the following, among the numerous cases decided upon the subject. *Darly* v. *Rice*, 2 Nott & McCord, 596 ; *Boyden* v. *Moore*, 11 Pick. 362 ; *Allen* v.

*Duncan*, Ib. 308; *Fellowes* v. *Williamson*, 1 Mood. & Malk. 306 (22 Eng. C. L. Rep. 316); 15 Serg. & R. 231. And this conclusion is strengthened by the fact in this case, that part of the declarations of McKinnie were admitted, but those which operated in his favor were excluded, though made at the same time. The cases of *Presley* v. *Quarles*, 31 Miss. 151, and *Scaggs* v. *The State*, 8 S. & M. 726, are not opposed to this view. The former has no bearing upon the question, and the declarations involved in the latter case, were made after the act in question was completed and past.

It is no objection to the admission of declarations made under circumstances like these, as evidence in behalf of the declarant, that they are false and simulated. For how is that to be ascertained? Certainly not by the court; for that would give to the court the dangerous power to exclude testimony merely on the ground of credibility. It must be determined by the jury upon consideration of the weight and credit due to the declarations under all the circumstances. In this respect, such declarations stand upon the same principle as admissions made by a party, all must be received, though the jury may discredit those which are favorable to the party making the admissions. So declarations made at the time of an act done and intimately connected with its execution, must be received in evidence as verbal acts, constituting part of the transaction; and it is for the jury to determine whether they are true or false, and to what extent they should be credited, and to give weight to them accordingly. Actions may be simulated as well as words; but it will scarcely be said that the acts of a person, done while engaged in any transaction, and having a direct connection with it, are not competent evidence as to the character and motives of his conduct, because they may be feigned. They are admissible in evidence, and their good faith, or falsehood, is to be determined by the jury.

Nor does the admission of such declarations rest entirely in the discretion of the court. It is sometimes a question to be decided by the court, whether the declarations were contemporaneous with the main fact done, or whether they are relevant to it, and to the question in controversy; and if not, the court has the right to exclude them for these reasons. But if they are made at the time the party whose conduct is the subject of consideration, was engaged in doing the act in question, and are plainly connected with it, in-

dicating his present intention and disposition, they are parts of the transaction which the court has no more power to exclude than any other part of the *res gestæ.*

I think it, therefore, very clear, that these declarations were admissible, and that it was error to exclude them.

And upon the grounds above stated, it is my opinion that the judgment is erroneous, and should be reversed.